The INCORPORATED TRUSTEES OF the GOSPEL WORKER SOCIETY, Plaintiff,

v.

UNITED STATES of America, DEPARTMENT OF the TREASURY, Defendant.

Civ. A. No. 78–1843.

United States District Court, District of Columbia.

Jan. 27, 1981.

Scott P. Crampton, Washington, D. C., for plaintiff.

John J. McCarthy, Donald J. Gavin, Robert L. Gordon, Judith A. Levinthal, U. S. Dept. of Justice, Tax Division, Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action under section 7428 of the Internal Revenue Code of 1954, 26 U.S.C. § 7428, in which plaintiff Incorporated Trustees of the Gospel Worker Society (Society) seeks a declaratory judgment that it is, as a religious organization, exempt from taxation under Code sections 501(a) and 501(c)(3).[1] Before the Court is defendant's motion for summary judgment. For the reasons stated below, the Court holds that plaintiff is no longer entitled to its tax exemption.

### I

In 1895, Reverend William Musselman, a Mennonite minister, founded the Gospel Worker Society in New Jersey. The Society was incorporated under the laws of Pennsylvania in 1906. Through the 1930's it maintained missions in various cities in Pennsylvania, Ohio, and New Jersey where its members engaged in public (evangelizing) efforts, such as distributing literature, conducting services, and holding street meetings. By the late 1930's the members consisted of about 80 ladies, who wore uniforms, received no pay for their work, and were maintained by the Society. During this period, the literature distributed by the Society and additional Sunday School materials were printed by the members at their own press, known as the Union Gospel Press. On November 6, 1937, the Internal Revenue Service granted an exemption from income taxation to the Society under section 101(c) of the 1936 Revenue Act (the present section 501(c)(3)), as an organization carrying on charitable, educational, religious, and missionary activities, including the care and maintenance of mission workers and the dissemination of religious literature to charitable, penal, and reform institutions. The exemption letter found that the Society's income was derived from gifts and the operation of the Gospel Press, and that this income was to be used to carry on the Society's religious, charitable, educational, and missionary work. This exemption was upheld in 1953 in a determination by the Internal Revenue Service.

At present, Timothy T. Musselman, the grandson of the founder, is in charge of the Gospel Press. He is without formal church affiliation and his experience prior to joining the Press in 1958 was in the management of commercial plants. The Society membership now consists of 23 mostly elderly ladies, living in a home maintained by the organization at a cost of $500,000 a year. As of 1962, the last mission had closed down, all missionary activity of the Society had ceased due to the advancing age of the membership, and the only discernible activity of the Society, apart from the maintenance of the ladies, was the publication of religious literature through the

---

1. The Internal Revenue Service revoked a previously-granted tax-exempt status and plaintiff requests review of that decision.

Gospel Press. Only four of the members actually work in the Press (either on an hourly wage or for a salary) and their input into the content of its publications consists largely in the review of the copy for type and smooth reading as distinguished from matters of substance. The members of the Society have little or no other involvement with its publication activities.[2] Contributors to the publications, and those responsible for substantive editing, are not members of the Society and they do not belong to any particular denomination.

The Gospel Press presently publishes a line of Sunday School materials, called the "Christian Life Series." The content of the series is dictated by general guidelines established by the Society and such guidelines are given to the outside contributors. The guidelines are not specific with regard to doctrine, and they do not require the authors to advance beliefs in any way unique to the Society. In fact, the materials follow the non-denominational International Sunday School Uniform Lesson Plan, a set of topics prepared by the National Council of Churches—a practice also followed by a number of non-exempt commercial publishers of fundamentalist Christian literature.[3] The Gospel Press pays the Council a royalty of one percent for these topics, and the commercial publishers pay a similar royalty. The Press sells about 60 percent of its publications to Christian bookstores at a standard commercial discount[4] (again much as do the commercial publishers of Sunday School materials). These bookstores, which number approximately 1,000, resell the materials at list price to churches and individuals.

Although some Gospel Press publications are published at a loss, the organization has shown increasing profits since the 1960's. Its accumulated surplus has grown from approximately 2 million dollars through the 1960's to over 5.3 million dollars in 1978. The salaries of the top officials of UGP have similarly increased: Mr. Musselman, for example, received $25,080 in 1970, and $103,387 in 1978.

By a report of November 5, 1976, an IRS District Director in Ohio proposed to revoke plaintiff's tax exemption, on the grounds that the religious and charitable activities for which the exemption had been granted had virtually ceased, and that the operation of the publishing business at a substantial profit indicated the existence of a trade or business unrelated to plaintiff's exempt purposes. Plaintiff appealed this proposal to the Regional Commissioner in Cincinnati, who proposed agreement by plaintiff to status as a private foundation with unrelated business income. Plaintiff then appealed to the National Office, which determined on March 17, 1978, that plaintiff's exemption be revoked. On July 12, 1978, a final adverse determination was made to revoke the Society's exempt status effective as of July 1, 1963, and the Regional Commissioner demanded that plaintiff file federal income tax returns for all years beginning July 1, 1970.[5] The instant action

---

2. From 1964 to 1973, the control of the printing operation was entirely in the hands of an outside board.

3. These publishers include Scripture Press, Standard Publishing, David Cook Publishing Co., and Christian Publications, Inc. A denial of Scripture Press's tax exemption was upheld in the Court of Claims in *Scripture Press Foundation v. United States, infra.*

4. Of its remaining publications, some are sold to dealers at a higher than commercial discount, but the purchaser rather than the Press pays postage; others (constituting less than 1/2 percent of the total cost of the Gospel Press publications as of 1977) are distributed without charge.

5. The following reasons were given for the final adverse determination:

During the intervening years from the date of your exemption letter to the present time your activities have changed dramatically. The Union Gospel Press has grown into one of the nation's largest producers of Sunday School literature and religious publications. These publications are not being used to promote the doctrinal beliefs of the Society, but are being sold to existing Protestant religions to be used in promoting their own beliefs. The Gospel Worker Society has little contact with the Union Gospel Press. The content is supplied by an Editorial staff and paid outside contributor writers (none of whom are members of the Society). In summary, the operation of the Union Gospel Press consti-

followed. As indicated, it requests the Court to declare under Code section 7428[6] that the Society still qualifies for an exemption under section 501(a) as a 501(c)(3) exempt organization, and that defendant's revocation of its exempt status was erroneous.

## II

Section 501(a) exempts from taxation organizations described in section 501(c)(3), that is,

> Corporations ... organized and operated exclusively for religious, charitable ... or educational purposes ... no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Under the regulations, an organization is organized exclusively for exempt purposes

if its articles of organization "limit the purposes of such organization to one or more exempt purposes" and "do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes." 26 C.F.R. § 1.501(c)(3)–1(b). Plaintiff's Articles of Incorporation, as amended in 1960, clearly meet this test.[7]

The question therefore becomes whether or not plaintiff meets the operational test set forth in the statute and the regulations. An organization is operated exclusively for exempt purposes

> if it engages primarily in activities which accomplish one or more of such exempt purposes .... An organization will not be so regarded if more than an insubstantial part of its activities is not in further-

---

tutes the primary and only significant activity still being carried on by the Incorporated Trustees of the Gospel Worker Society and this activity is not substantially related to the performance of the functions for which you were granted exemption.

Therefore, your organization does not qualify as one which operated exclusively for one or more of the purposes specified in section 501(c)(3).

**6.** Section 7428(a) provides that in a case involving

a determination by the Secretary ... with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from taxation under section 501(a) ... the district court of the United States for the District of Columbia may make a declaration with respect to such initial qualification or continuing qualification.... For purposes of this section, a determination with respect to a continuing qualification ... includes any revocation of or other change in qualification....

Limitations on this jurisdictional provision are provided by section 7428(b), which includes the requirement that a petitioner exhaust his administrative remedies. The parties here agree that administrative remedies have been exhausted.

While section 7428 itself does not contain the standard or scope of review to be employed by the District Court in examining the determination of the Secretary, it has been held, on the basis of the legislative history and the practice of the U.S. Tax Court, that the review is to be de novo. *The Big Mama Rag, Inc. v. United States,* 494 F.Supp. 473 at 474 (D.D.C. April 30,

1979), *rev'd on other grounds,* 631 F.2d 1030 (D.C.Cir.1980). Normally, the Court's decision will be based on the facts as represented in the administrative record (see Tax Court Rule 217(c)); in the case of revocation, however, the Court may make findings of fact differing from the administrative record (Tax Court Rule 217(c); *Big Mama Rag, supra,* slip Op. at 1 n.1). The burden of proof is on the petitioner to overcome the ground for denial or revocation set forth in the IRS determination (*Christian Manner International v. Commissioner,* 71 T.C. 661, 664–65 (1979)).

**7.** Paragraph 2 of the Articles of Incorporation reads as follows:

The purposes for which the said corporation is formed are:

(1) to propagate the Christian Gospel by means of the printing, publication and dissemination of Christian literature and the maintenance of Missions;

(2) to receive and hold property, real and personal, to be utilized in furtherance of the above purposes;

(3) to do whatever is deemed necessary, useful, or conducive to carrying out any of the purposes of the corporation and to exercise all other authority enjoyed by corporations generally by virtue of the provisions of the Pennsylvania Non-Profit Corporation Law; provided, however, that no part of the net earnings of the corporation shall inure to the benefit of any private shareholder or individual, and no substantial part of its activities shall be carrying on propaganda, or otherwise attempting to influence legislation.

ance of an exempt purpose. 26 C.F.R. § 1.501(c)(3)–1(c)(1).

The cases interpreting the operational test fall into two types of factual patterns. The first type involves an organization conducting religious activities which also carries on a trade or business for profit. The main inquiry in this type of situation is whether the profit-producing activity is merely incidental to and in furtherance of the religious activities and their exempt purpose.[8] Clearly, plaintiff does not fit this pattern. On the factual record of this case the Court finds that plaintiff's primary, if not sole, activity is the income-producing publishing enterprise of the Press. All other significant activities of the Society appear to have ceased years ago.[9]

The second type of case involves an organization whose sole activity is an income-producing one. Since "it is possible for such an activity to be carried on for more than one purpose ... the critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the non-exempt one of operating a commercial business producing net profits for petitioner." *BSW Group Inc. v. Commissioner*, 70 T.C. 352, 356 (1978).[10]

It is a factual question whether plaintiff's primary purpose in turning a profit has been to further the exempt purpose for which it was organized,[11] and the Court is able to resolve that issue here on the basis of the record before it.[12]

The first factual circumstance which the Court must take into account is the 5.3 million dollars accumulated profits possessed by plaintiff as of 1978. Although the fact that an organization's profits are very large is not conclusive of a non-exempt purpose, it is "evidence indicative of a commercial character." *Scripture Press Foundation v. United States, supra*, 285 F.2d at 803. See *American Institute for Economic Research v. United States*, 302 F.2d 934, 938, 157 Ct.Cl. 548 (1962); *BSW Group, Inc. v. Commissioner, supra*, 70 T.C. at 357;

---

**8.** See, *e. g., Scripture Press Foundation v. United States*, 285 F.2d 800 (Ct.Cl.1961) (organization's door-to-door evangelism and religious instructional activities incidental to sale of religious literature for profit); *Saint Germain Foundation v. Commissioner*, 26 T.C. 648 (1956) (organization's sale of religious publications producing income incidental to its religious purposes as manifested through the conduct of religious classes and conclaves.)

**9.** It could perhaps be argued that plaintiff carries on another activity, that is, the maintaining of the retired members of the Society in their home. While clearly not a profit-making venture, this activity does not serve to accomplish the purposes of the Society as set forth in the Articles of Incorporation (*i. e.*, the propagation of the Gospel) given that the members so maintained no longer participate actively in any missionary work. In addition, the fact that the maintenance of the retired members costs only $500,000 a year, while the Gospel Press has an accumulated surplus of over 5 million dollars, plainly refutes any assumption that the Gospel Press activities serve only to further the upkeep of the ladies. See *Scripture Press Foundation v. United States, supra*, 285 F.2d at 805. In any case, plaintiff does not argue that its publishing activities have been merely incidental to the maintenance of Society workers; it instead contends that the primary purpose of the publishing business is still exempt.

**10.** See, *e. g., Christian Manner International v. Commissioner, supra* (petitioner's primary if not sole activity is the promotion, distribution and sale of his book, with the principal non-exempt purpose of turning a profit); *Pulpit Resource v. Commissioner*, 70 T.C. 594 (1978) (petitioner's sole activity is the publication and sale of a religious journal, but this furthers as a primary exempt purpose the improving of preaching skills of clergy); *Fides Publishers Association v. United States*, 263 F.Supp. 924 (N.D.Ind.1967) (sole activity of plaintiff has substantial non-exempt purpose of the publication and sale of religious literature at a profit).

**11.** *BSW Groups, Inc. v. Commissioners, supra*, 70 T.C. at 357.

**12.** The only fact as to which plaintiff contends there exists a genuine issue is that of whether or not Society constitutes a "church." But that issue is not in any way determinative of the lawsuit, since section 501 of the Code does not exempt entities entitled "churches," but "corporations ... operated exclusively for religious ... purposes." The section 501 determination must be made on the basis of an exemption of the facts from which such purposes can be inferred, not from the label plaintiff applies to itself.

*Golden Rule Church Association v. Commissioner*, 41 T.C. 719, 731 (1964).

Plaintiff asserts that these funds have been gradually set aside since 1970, when a decision was made that the Press' publishing plant needed a thorough renovation and expansion. It is contended that the expansion was designed better to spread the Gospel, and that this purpose is clearly exempt and in conformance with the purposes for which the Society was organized.

While it is theoretically conceivable that a religious purpose may underlie the enormous accumulation of profits since 1970, the sheer size of the surplus and the lack of anything more concrete than the word of plaintiff's officers as to its future use militates against such a finding.[13] Even if it be assumed, *arguendo*, that the funds now accumulated will eventually be used for expansion, it would not help plaintiff's case, for the purpose of the expansion may well be the accumulation of still greater profits. Plaintiff has given the Court no basis to find otherwise.[14]

Another material circumstance is the abrupt increase in the salaries of the top personnel of the Gospel Press. As stated above, Mr. Musselman's salary increased from approximately $25,000 in 1970 to over $100,000 in 1978. Two other top officials have received increases from $16,153 to $72,377 and from $5,790 to $42,896, respec-

tively, in the same time period. The officers of a tax-exempt organization may of course receive remuneration for their services without jeopardizing the exemption. See *Pulpit Resource v. Commissioner, supra*, 70 T.C. at 612.[15] However, the substantial amount of the salaries at present and the rapidity of their rise is troubling. While they may not be directly indicative of profits inuring "to the benefit of any private shareholder or individual" as prohibited by section 501(c)(3) and the regulations thereunder, they are at least suggestive of a commercial rather than non-profit operation.

Finally, it is significant that the Gospel Press is in direct competition with a number of commercial publishers. Like these publishers, the Gospel Press follows the lesson plan provided by the National Council of Churches; like them, it pays a royalty to the National Council; like them it sells dealers using a similar standard commercial discount; and like them, it directs its publications at the same non-denominational market.[16] It has been held that "[c]ompetition with commercial firms is strong evidence of the predominance of non-exempt commercial purposes." *BSW Group, Inc. v. Commissioner, supra*, 70 T.C. 358; *American Institute for Economic Research, supra*, 302 F.2d at 938.

---

**13.** In response to interrogatories, plaintiff has outlined specific plans for the use of the accumulated funds. There is no way of knowing, however, whether the funds in fact will ever be put to such use, and they have not been legally committed thereto.

**14.** The burden of proof to overcome the grounds set forth by the IRS in its revocation lies with the plaintiff (see note 6, *supra*)—that is, plaintiff may overcome the IRS finding that the operation of the Gospel Press is not substantially related to the performance of an exempt function. Plaintiff has not sufficiently established a connection between the accumulation of profits and some religious purpose so as to overcome that finding.

**15.** In *Pulpit Resource*, the director of an organization publishing a religious journal received approximately $15,000 per year. The Tax Court found this salary not to be an indication of an intent to drain profits from the operation

of the organization, either now or in the future, "because [the director] receives no royalties from his own sermons that are sold and the administrative record reflects his sincerity and devotion to religious concepts." 70 T.C. at 612. Here, the amount of the salaries is far greater, and Mr. Musselman's religious beliefs and affiliations are not a matter of record.

**16.** The issue of whether or not an organization's activities are directed toward a specific religion is not determinative of whether the primary purpose behind the organization's activity is to make a profit. *Pulpit Resource v. Commissioner, supra*, 70 T.C. at 612. However, in the case of the Gospel Press, the fact that its publications are non-denominational contributes to the resemblance between its publishing activities and those of commercial, non-exempt publishers of Christian literature with whom the Gospel Press competes.

Although none of the factual circumstances enumerated above, taken singly, is conclusively determinative of a non-exempt purpose behind the Press' publishing activities (the sole activity seriously conducted by the Society), taken together they present a picture of a publishing enterprise the primary purpose of which is profits, not salvation. To put it another way, to find that the primary purpose behind the activities of the Gospel Worker Society at the present time is religious rather than commercial would be "to avoid reality." *Fides Publishers Association v. United States, supra*, 263 F.Supp. at 935.

Plaintiff in essence argues that the Court must nevertheless hold it to be tax exempt because to do otherwise would amount to governmental interference with religion in violation of the First Amendment. That argument is not well taken. As stated by the Court of Appeals for the Eighth Circuit,

The receiving of an exemption is ... a matter of legislative grace and not a constitutional right. As long as exemptions are denied by the Commissioner on a non-discriminatory basis using specific and reasonable guidelines and without inquiry into the merits of the particular religious doctrines, the withholding of religious exemptions is permissible under the Constitution. *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir. 1966), *cert. denied*, 385 U.S. 1026 [87 S.Ct. 752, 17 L.Ed.2d 674] (1967). See also *Winters v. Commissioner*, 468 F.2d 778, 781 (2d Cir. 1972).

Plaintiff has not shown that the revocation was in any way based upon a judgment of the merits of the religious tenets contained in Gospel Press publications; nor has it attempted to prove illegal discrimination in the revocation of exemption. Indeed, other organizations whose primary activities consist of the publication and distribution of religious literature at a profit have consistently been held liable for the tax on their income, however religiously inspired the sale of such literature might be. See *e. g.,*

*Christian Manner International, Inc. v. Commissioner, supra; Scripture Press Foundation v. United States, supra.*

The Court therefore holds that the Gospel Worker Society no longer qualifies as an exempt organization under section 501(c)(3) of the Internal Revenue Code.

### III

The IRS also revoked the Society's exemption effective July 1, 1963, and required it to file federal income tax returns for the year beginning July 1, 1970, and all subsequent years. The reason given for this retroactive revocation was that "all missions and missionary activity ceased by [July 1, 1963]." [17]

26 C.F.R. § 601.201(1)(5) provides that revocations of prior rulings will not be applied retroactively where

(i) there has been no misstatement or omission of material facts, (ii) the facts subsequently developed are not materially different from the fact on which the ruling was based, (iii) there has been no change in the applicable law, (iv) the ruling was originally issued with respect to a prospective or proposed transaction, *and* (v) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment (emphasis added).[18]

Plaintiff submits that it meets all of the tests enumerated in this regulation. The Court cannot agree. The facts upon which the revocation is based *are* materially different from the facts upon which the 1937 ruling and its affirmation in 1953 were based, and the Society therefore does not qualify under the second condition of the regulation. At those earlier times, the Society's missionary work was thriving, and it could realistically be said that the income produced by its publishing enterprise was used to carry on its religious and missionary

---

17. IRS letter of July 12, 1978.

18. See *Automobile Club v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957);

*Lansons, Inc. v. Commissioner*, 622 F.2d 774, (5th Cir. 1980).

activities. Since approximately 1960, the situation has drastically changed. The printing and distribution of religious literature is no longer an integral part of and incidental to the religious activities of plaintiff, because those activities have effectively ceased to exist. Meanwhile, the publishing business has taken on more and more of a commercial hue and has become a highly efficient business venture.[19]

■ Plaintiff has not met its burden of showing that IRS's action was erroneous in revoking its exemption retroactively to 1963, and in requiring returns to be filed beginning in 1970. See note 6, *supra*. 1963 was the first year in which the Society ceased to operate any missions; 1970 was the year in which its accumulated surplus began its drastic rise.[20] Plaintiff has presented no reason why the Court should reject these particular dates as ill-chosen. The Court affirms the final adverse determination of the Internal Revenue Service of July 12, 1978, declares under section 7428 of the Internal Revenue Code that the Gospel Worker Society does not qualify as a tax-exempt organization under sections 501(a) and 501(c)(3), effective retroactively to July 1, 1963, and directs that plaintiff file federal income tax returns for the year beginning July 1, 1970 and all subsequent years. An order is being entered accordingly contemporaneously herewith.

19. In addition, the Society probably fails to qualify under the fifth condition of the regulations in that it is unclear that plaintiff's continued reliance on the Commissioner's earlier exemption determination was reasonable. 26 C.F.R. § 1.501(a)–1(a)(2) provides that

an organization that has been determined ... to be exempt under section 501(a) ... may rely upon such determination so long as there are not substantial changes in the organization's character, purposes, or methods of operation.

The character of plaintiff's operations has substantially changed since it was determined to be an exempt organization. It therefore had no right to continue to rely upon that determination under the cited regulation.

20. The Society's accumulated surplus has grown as follows since 1963:

| Year Ending | Net Worth or Surplus |
| --- | --- |
| June 30, 1963 | 2,184,068 |
| June 30, 1964 | 2,029,999 |
| June 30, 1965 | 1,989,304 |
| June 30, 1966 | 1,979,291 |
| June 30, 1967 | 1,984,181 |
| June 30, 1968 | 2,081,147 |
| June 30, 1969 | 2,069,839 |
| June 30, 1970 | 2,705,823 |
| June 30, 1971 | 3,463,569 |
| June 30, 1972 | 3,918,455 |
| June 30, 1973 | 4,548,822 |
| June 30, 1974 | 4,903,005 |
| June 30, 1975 | 5,082,177 |
| June 30, 1976 | 5,317,316 |
| June 30, 1977 | 5,275,027 |
| June 30, 1978 | 5,321,248 |