**LIVING FAITH, INC., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 90–3626.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1991.

Decided Dec. 2, 1991.

Lorentz W. Hanson, White Plains, N.Y., for petitioner-appellant.

Abraham N.M. Shashy, Jr., I.R.S., and Gary R. Allen, Robert S. Pomerance (argued), Nancy G. Morgan, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, Washington, D.C., for respondent-appellee.

Before WOOD, Jr., FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Living Faith, Inc. (Living Faith) appeals the Tax Court's affirmance of a determination by the Commissioner of the Internal Revenue Service (Commissioner) that Living Faith was not operated for exempt purposes within the meaning of § 501(c)(3) of the Internal Revenue Code (I.R.C.), 26 U.S.C. § 501(c)(3). This Court has jurisdiction to review the Tax Court's ruling pursuant to I.R.C. § 7482, 26 U.S.C. § 7482. Be-

cause this case was submitted to the Tax Court for decision on a stipulated administrative record, the record is presumed true for purposes of this appeal. Upon review of the record, we find that the Tax Court's determination was not clearly erroneous and affirm its decision.

## I.

Living Faith was incorporated as a not-for-profit corporation on September 4, 1986, under the laws of Illinois. According to its articles of incorporation, Living Faith was established for the purpose of keeping with the doctrines of the Seventh-day Adventist Church.[1] Living Faith is a member of the Association of Self–Supporting Institutions of the Seventh-day Adventist Church, but, like all members, is independent from the church and receives no direct funding. Seventh-day Adventists believe that the concept of health is permeated with religious meaning. Good health, according to Seventh-day Adventists, promotes virtuous conduct, and is furthered by a vegetarian diet and abstention from tobacco, alcohol, and caffeine. Ill health, in contrast, promotes sin, with the original sin consisting of eating food condemned by God.

Living Faith operates two vegetarian restaurants and health food stores, in Oak Brook Terrace, Illinois, and Glen Ellyn, Illinois, in a manner consistent with these religious beliefs. These two facilities—the subject of this litigation—are open to the public, and operate under the name "Country Life." Country Life is a worldwide chain of independently operated restaurants and food stores. Living Faith is licensed to use the name, without charge, by Oak Haven, Inc., a wholesale food distributor. Oak Haven's guidelines require Country Life facilities to employ Seventh-day Adventist management and maintain a

---

**1.** The articles provide, in relevant part:
Living Faith, Inc. is a not-for-profit corporation organized exclusively for charitable and religious purposes as set forth in section 501(c)(3) of the Internal Revenue Code, including the diffusion of moral and religious knowledge by means of public worship, encouragement, maintenance and promotion of health, and the building and/or leasing and

maintenance of parsonages, chapels, and such other religious and charitable facilities as may be necessary or proper to the work of this corporation ... all to carry out the religious purposes of the corporation in keeping with the doctrines of the Seventh-day Adventist Church, including the health programs long sponsored by the church....

good working relationship with the local Seventh-day Adventist Church. They also require that management have business ability, undergo six months training in operating a Country Life restaurant, and maintain good business relations with suppliers and the community.[2]

The Oak Brook Terrace facility operates out of a 3,200 square foot leased space in a shopping center, of which 2,400 square feet is used for the restaurant. Its hours of operation are:

**Restaurant**

| | |
|---|---|
| Sunday, Tuesday, Wednesday, Thursday | 11:30 a.m.–7:30 p.m. |
| Monday | 11:30 a.m.–4:00 p.m. |
| Friday | 11:30 a.m.–2:00 p.m. |
| Saturday | Closed |

**Health Food Store**

| | |
|---|---|
| Sunday–Thursday | 10:00 a.m.–8:00 p.m. |
| Friday | 10:00 a.m.–3:00 p.m. |
| Saturday | Closed |

Operations at the Glen Ellyn facility are substantially similar to those at Oak Brook Terrace. Living Faith sets its meal and food prices at market rates. Buffet prices at its restaurants are set at approximately three times the wholesale cost of food, a formula commonly used in the food business, and retail prices at its health food stores are maintained at levels recommended by its wholesalers. According to Living Faith, its prices are similar to, and in some instances higher than, other vegetarian restaurants and health food stores. Products sold at the health food stores include grocery items, such as packaged and bulk foods, as well as vitamins, spices, and toiletries.

In addition to purveying food and health products, Living Faith disseminates various informational materials which promote both "[t]he healing message of Jesus Christ" and the "world famous" Country Life restaurants. Appendix at A34, A35. The literature is placed by the counter, the door, at the end of the buffet line, and on each table. Living Faith also offers books on religious subjects at no charge to its patrons. Customers are not required to take or read the literature. Living Faith states that its "literature evangelism" is currently limited to this in-store distribution, and estimates that 10 to 12 people have joined the Seventh-day Adventist Church as a result of its efforts.

Each day before the facilities open, Living Faith conducts a devotional talk by a staff member, hymn singing, and a Bible reading for workers. One Saturday each month, Living Faith provides the public an opportunity to sample vegetarian cooking by offering free meals. Those who attend may also peruse the Seventh-day Adventist literature and obtain information about the Church. Living Faith offers to the public a five-week cooking school which promotes vegetarian cooking. Classes meet on a weekly basis, during hours when the restaurants and food stores are closed, and are priced at $20 per person, or $25 per married couple, plus $15 for a cookbook. The organization also offers weekly Bible study class, free of charge, during hours when the facilities are closed. It occasionally provides meals to the needy in ex-

---

**2.** Informational material provided by Oak Haven states:

Some of the purposes and possibilities of learning [at Country Life Natural Foods and Vegetarian Restaurant] are:
1) to teach restaurant and store management[.]
2) to teach vegetarian cooking[.]
3) to minister to those in the cities who are interested in changing their ways of life—to offer them something better—an alternative.
4) to learn how to communicate with others.
Appendix at A75.

change for chores, such as washing dishes, and has collected and donated to charity approximately 100 plastic bags of used clothing.

Living Faith's financial statements for the 12–month periods ending September 30, 1987, and September 30, 1988, show the following results:

|  | 1987 | 1988 |
|---|---|---|
| Sales revenue | $ 73,134.78 | $280,104.38 |
| Cost of sales | 34,576.03 | 158,340.22 |
| Gross profit | 38,558.75 | 121,705.99 |
| General & administrative expenses | 91,190.80 | 155,220.85 |
| Operating loss | (52,632.05) | (33,514.86) |
| Donations | 101,062.63 | 46,226.73 |
| Miscellaneous income |  | 6,999.20 |
| Net income | 48,430.58 | 19,711.07 |

Stipends for Living Faith's five-member staff totalled $25,663.67 for the fiscal year ending September 30, 1987,[3] and increased to $63,673.93 the following fiscal year. According to Living Faith, its staff is composed of people who otherwise might have difficulty in finding employment.[4] Several staff members also serve as officers and directors of Living Faith. Three of these—the president, vice president, and secretary—are ordained deacons of the Seventh-day Adventist Church. The chairperson, who is not on the staff, is an ordained Elder of the Church.

According to Living Faith, any profits realized from its operations will be used to expand its health ministry in accordance with Seventh-day Adventist tenets. Its application for § 501(c)(3) tax exemption states that its future plans include the establishment of an "outpost evangelism program" where people "may live in harmony with the principles of the Bible and the writings of Ellen G. White," a founder of the Seventh-day Adventist Church. Appendix at A2. However, its current operations are limited to the two restaurants and health food stores.

Living Faith filed its application for tax-exempt status on March 29, 1988. The Commissioner denied Living Faith's application, finding that it was not operated exclusively for exempt purposes within the meaning of § 501(c)(3). Living Faith timely protested the ruling, and the Commissioner subsequently sent notice of the final adverse ruling. Living Faith filed a petition for a declaratory judgment with the Tax Court, pursuant to I.R.C. § 7428(a), requesting tax-exempt status pursuant to § 501(a) as an organization described in § 501(c)(3).

The Tax Court upheld the Commissioner's ruling, finding that Living Faith conducts its operations with a substantial commercial purpose and therefore does not qualify as a tax-exempt organization. *Living Faith, Inc. v. Commissioner*, 60 T.C.M. (CCH) 710 (1990). We now examine the Tax Court's decision.

## II.

█ Living Faith contends that it operates its restaurants and health food stores with the exclusive, tax-exempt purpose of

---

3. In addition to its usual operating expenses, Living Faith provides room, board, stipend ($100 per month per adult and $10 per month per child), travel, and miscellaneous expenses for its "volunteer" staff of five people. In a rider to its application for exemption, Living Faith stated that these expenses totalled $18,850 for the year ending September 30, 1987. Its financial statement listed "stipends" of $25,-663.67 for the same period. The record does not reflect how staff expenses differ from stipends.

4. Living Faith states, for example, that one of its workers is learning the English language, two are in their mid-fifties, and another is a recovering alcoholic.

furthering the religious work of the Seventh-day Adventist Church as a health ministry.[5] As the taxpayer claiming the exemption, Living Faith bears the burden of proving entitlement to it. *Granzow v. Commissioner,* 739 F.2d 265, 268 (7th Cir. 1984); *see also Church of Scientology v. Commissioner,* 823 F.2d 1310, 1317 (9th Cir.1987), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988); *Senior Citizens Stores, Inc. v. United States,* 602 F.2d 711, 713 (5th Cir.1979). Section 501(c)(3) establishes a tax exemption, pursuant to § 501(a), for organizations "organized and operated exclusively for religious, charitable ... or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual...." To comport with these provisions, an entity must be both "organized and operated exclusively" for at least one of the listed exempt purposes. Treas.Reg. § 1.501(c)(3)1(a). The parties do not dispute that Living Faith satisfies the "organizational" test, or that its net earnings do not inure to any individual's benefit. The sole issue, therefore, is whether Living Faith is "operated exclusively" for exempt purposes within the meaning of § 501(c)(3).

■ In evaluating this issue, we focus on "the purposes toward which an organization's activities are directed, and not the nature of the activities." *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356–57 (1978). The purposes need not be solely religious; courts recognize that a non-exempt purpose, even "somewhat beyond a de minimis level," may be permitted without loss of exception. *Copyright Clearance Center, Inc. v. Commissioner,* 79 T.C. 793, 805 (1982); *see also Church in Boston v. Commissioner,* 71 T.C. 102, 107 (1978) ("exclusively," as used in this context, does not mean "solely" or "absolutely without exception"). The nonexempt purpose, however, cannot be substantial. "The presence of a single non-exempt pur-

pose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes." *American Ass'n of Christian Schools Voluntary Employees Beneficiary Ass'n Welfare Plan Trust v. United States,* 850 F.2d 1510, 1513 (11th Cir.1988) (quoting *Better Business Bureau v. United States,* 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945)); *see also* Treas.Reg. § 501(c)(3)1(c)(1) (organization not "operated exclusively" for exempt purposes "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.").

■ A single activity may be carried on for more than one purpose. The fact that an organization's primary activity may constitute a trade or business does not, of itself, disqualify it from classification under § 501(c)(3), provided the trade or business furthers or accomplishes an exempt purpose. Treas.Reg. § 1.501(c)(3)–1(c)(1), – 1(e)(1); *Dumaine Farms v. Commissioner,* 73 T.C. 650, 668 (1980); *B.S.W. Group,* 70 T.C. at 357. If one of the activity's purposes, however, is substantial and nonexempt (*e.g.,* commercial), the organization will be denied exempt status under § 501(c)(3), even if its activity also furthers an exempt (*e.g.,* religious) purpose. *Schoger Found. v. Commissioner,* 76 T.C. 380, 386 (1981).

Living Faith contends that the Tax Court erred in upholding the Commissioner's determination that its operations have a substantial commercial purpose. It makes essentially three claims. First, Living Faith argues the Tax Court applied an incorrect legal standard, therefore requiring this Court to undertake a plenary review of the decision. Second, Living Faith maintains that, even under a clearly erroneous standard, the Tax Court's determination was incorrect. Finally, Living Faith asserts that the Tax Court unconstitutionally discriminated against it by judging the merits of its beliefs in denying it tax-exempt sta-

---

**5.** Informational material distributed by Living Faith contains the following statement of purpose: "Country Life is a 'not for profit' health ministry whose goal is to help people achieve a better life through the intelligent application of the laws of health and spiritual renewal in Christ." Appendix at A35.

tus. We first determine the proper standard of review.

## A.

■ Whether an activity has a substantial nonexempt purpose is a question of fact to be determined under the facts and circumstances of each case. *United Missionary Aviation, Inc. v. Commissioner,* 60 T.C.M. (CCH) 1152, 1156 (1990); *see Manning Ass'n v. Commissioner,* 93 T.C. 596, 603 (1989); *B.S.W. Group,* 70 T.C. at 357. The Tax Court's factual finding that an organization is not operated exclusively for exempt purposes cannot be disturbed on appeal unless clearly erroneous. *Church by Mail, Inc. v. Commissioner,* 765 F.2d 1387, 1390 (9th Cir.1985); *Senior Citizens Stores,* 602 F.2d at 713; *Parker v. Commissioner,* 365 F.2d 792, 798 (8th Cir. 1966), *cert. denied,* 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967). Here, however, Living Faith argues that we should apply a *de novo* standard of review, apparently on the ground that the Tax Court's finding of fact that Living Faith has a substantial commercial purpose is predicated on a misunderstanding of the governing rule of law. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502 (1984).

Living Faith bases its contention on essentially two arguments, neither of which we find persuasive. It first claims that the Tax Court effectively established a new legal standard by using the phrase "essential ingredient" in examining the role of religion in Living Faith's operations. The Tax Court stated, for example, that it was "not persuaded that [Living Faith's religious] beliefs were an essential ingredient of [its] operations." 60 T.C.M. (CCH) at

715. Living Faith contends that the court's "essential ingredient" approach improperly emphasized the nature of Living Faith's activities, rather than its purposes, thereby permitting the court to determine whether the means Living Faith selected to pursue its beliefs were the most effective available to further the health principles of the Church. We disagree.

In more than one instance, the Tax Court stated the proper standard, that "[t]he critical inquiry is whether petitioner's activity encompasses a substantial nonexempt purpose irrespective of the presence of other exempt purposes." 60 T.C.M. (CCH) at 713.[6] This analysis demonstrates that it found Living Faith's activities to be imbued with a substantial commercial purpose. Although the Tax Court did not clearly delineate how it used the "essential ingredient" phraseology, we cannot conclude, as Living Faith seems to suggest, that the court elevated the phrase into a *de facto* legal standard in place of the insubstantiality test—especially given that "[n]either the Internal Revenue Code, the regulations, nor the case law provides a general definition of 'insubstantial' for purposes of section 501(c)(3)." 60 T.C.M. (CCH) at 713.[7]

Living Faith also contends that the Tax Court failed to consider all of the relevant factors used by courts to determine the existence of a substantial nonexempt purpose. It asserts, for example, that the court neglected to address its "good faith" religious belief and "good works," and contends that the court focused solely upon its finances and competition with other businesses. A review of the Tax Court opinion, however, indicates that the court did consider these other factors. The court explicitly acknowledged that Living Faith con-

---

**6.** In one paragraph which contains the "essential ingredient" phraseology, the Tax Court also stated that it was "not convinced that the recitation of the possible use of restaurants and health food stores as a potential instrument of achievement of religious goals is sufficient to overcome the clear commercial purpose with which petitioner's activities was imbued," 60 T.C.M. (CCH) at 713, further illustrating that the Tax Court properly applied the "insubstantiality" standard.

**7.** We also note that, although an organization may be exempt under § 501(c)(3) even if it operates a trade or business as a substantial part of its activities, the organization must operate primarily to further the exempt purpose or purposes. Treas.Reg. § 1.501(c)(3)1(e). Here, the "essential ingredient" phrase employed by the Tax Court helped in determining whether religion was the primary purpose—*i.e.,* the "essential ingredient"—of Living Faith's operations.

ducted such activities as disseminating literature about the Seventh-day Adventist religion and after-hours Bible reading, but found these activities "clearly peripheral and incidental to the substantial commercial purpose" of its restaurants and health food stores. 60 T.C.M. (CCH) at 713–14.

Because we find that the Tax Court based its factual findings on a proper legal standard, we accept them unless clearly erroneous. The critical inquiry, therefore, is whether sufficient evidence exists in the record to support the Tax Court's finding that Living Faith operates for a substantial commercial purpose.[8]

## B.

■ When undertaking this inquiry, we look to various objective indicia. The particular manner in which an organization's activities are conducted, the commercial hue of those activities, competition with commercial firms, and the existence and amount of annual or accumulated profits, are all relevant evidence in determining whether an organization has a substantial nonexempt purpose. *See B.S.W. Group,* 70 T.C. at 357; *United Missionary Aviation, Inc.,* 60 T.C.M. (CCH) at 1156–57. Living Faith argues that the Tax Court unduly relied on such factors, however, and inordinately emphasized the nature of its activities. Living Faith maintains that "great weight [should] be given to the assertions of religious purpose made in good faith on behalf of the organization." Appellant's Br. at 26. In this regard, it asserts that good health is an especially important component of the Seventh-day Adventist Church, and that its Country Life operations further this religious purpose.

While we agree with Living Faith that an organization's good faith assertion of an exempt purpose is relevant to the analysis of tax-exempt status, we cannot accept the view that such an assertion be dispositive. Put simply, saying one's purpose is exclusively religious doesn't necessarily make it so.

This Court and others have consistently held that an organization's purposes may be inferred from its manner of operations. *See, e.g., Bethel Conservative Mennonite Church v. Commissioner,* 746 F.2d 388, 391 (7th Cir.1984) (facts "must be explored to ascertain the predominant or primary purpose for which the organization was formed, and also the manner of its operation.") (quoting *Passiac Hebrew Burial Ass'n v. United States,* 216 F.Supp. 500 (D.N.J.1963)); *Senior Citizens Stores,* 602 F.2d at 713; *Elisian Guild, Inc. v. United States,* 412 F.2d 121 (1st Cir.1969); *United Missionary Aviation,* 60 T.C.M. (CCH) at 1156 ("The manner in which an organization conducts its activities is relevant evidence of a forbidden purpose."). An organization's activities, and not solely its members' devotion to their work, determines entitlement to tax exemption. *est of Hawaii v. Commissioner,* 71 T.C. 1067, 1082 (1979), *aff'd without op.,* 647 F.2d 170 (9th Cir.1981). Indeed, this Court previously has stated that "it is necessary and proper ... to survey all the activities of [an] organization, in order to determine whether what the organization in fact does is to carry out a religious mission or to engage in commercial business." *United States v. Dykema,* 666 F.2d 1096, 1100 (7th Cir. 1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982); *see also United Missionary Aviation,* 60 T.C.M. (CCH) at 1156 ("courts have generally focused on how an organization carries on its activities, implicitly reasoning that an end can be inferred from the chosen means."). While "the inquiry must remain that of determining the purpose to which the ... business activity is directed," *Presbyterian & Reformed Publishing Co. v. Commissioner,* 743 F.2d 148, 156 (3d Cir.1984), the activities provide a useful indicia of the organization's purpose or purposes. Thus, keeping in mind Living Faith's good faith assertion of a religious purpose, we examine Living Faith's activities and manner of operations.

---

**8.** We note further that, even if we were to apply a *de novo* standard of review, based on the record before us we still would uphold the Tax Court's determination.

Although an organization is not disqualified from tax-exempt status solely because its primary activity constitutes a business, when it conducts a business with an apparently commercial character as its primary activity, "that fact weighs heavily against exemption." *B.S.W. Group*, 70 T.C. at 359. Living Faith, whose primary activity consists of operating restaurants and food stores, engages in precisely such conduct. Its operations are "as presumptively commercial" as the sale of prescription drugs to the general public and holders of special VIP cards, *see Federation Pharmacy Servs., Inc. v. Commissioner*, 625 F.2d 804, 808 (8th Cir.1980), the sale of consulting services, *see B.S.W.*, 70 T.C. at 358, "or the sale of any other product." *Federation Pharmacy*, 625 F.2d at 808.

It is significant that Living Faith is in direct competition with other restaurants. "Competition with commercial firms is strong evidence of the predominance of non-exempt commercial purposes." *B.S.W. Group*, 70 T.C. at 358; *see Incorporated Trustees of Gospel Worker Soc. v. United States, Dep't of Treas.*, 510 F.Supp. 374, 379 (D.D.C.), *aff'd without op.*, 672 F.2d 894 (D.C.Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982). Living Faith has failed to demonstrate that its business, which operates in a shopping center, does not compete with other restaurants and food stores. Living Faith's prices, for example, are set "competitively with area businesses," Appendix at A56, using pricing formulas common in the retail food business. This lack of below-cost pricing militates against granting an exemption. *See Federation Pharmacy*, 625 F.2d at 807; *Senior Citizens Stores*, 602 F.2d at 714; *B.S.W. Group*, 70 T.C. at 359–60. Indeed, the profit-making price structure looms large in our analysis of its purposes. *See Easter House v. United States*, 12 Cl.Ct. 476, 486 (1987).

That Living Faith competes with other commercial enterprises is also indicated by its informational materials, which are apparently promotional as well. The use of promotional materials and "commercial catch phrases" to enhance sales are relevant factors in determining whether an organization "operate[s] in the same manner as that of any profitable commercial enterprise." *United Missionary Aviation*, 60 T.C.M. (CCH) at 1156. A few examples are illustrative. A tract dated June 1988 contains not only religious references ("The Lord has helped us to provide a haven of rest to nourish body, mind and soul"), but significant commercial overtones as well ("If you bring this story to our restaurant we will give you one meal free when you buy one. Limit one meal per story."). Appendix at A34. A mailing distributed by Living Faith states its religious purpose ("Country Life is a 'not for profit' health ministry whose goal is to help people achieve a better life through the intelligent application of the laws of health and spiritual renewal in Christ"), but also contains language that is clearly commercial in nature (Country Life offers "[w]orld famous restaurants, superb vegetarian cuisine since 1963"). Appendix at A35.[9] Another tract promotes Living Faith's various activities, including the Bible study classes and vegetarian cooking classes, and states, "We want to serve you better with expanded hours and services."[10] Appendix at A79. These materials contain a strong "commercial hue," *see B.S.W. Group*, 70 T.C. at 357, and thus provide an indicia of a forbidden commercial purpose.

---

**9.** Similarly, a newspaper review, after noting that "one of the primary goals of Country Life ... is to expand and eventually open a natural healing retreat in the area," states:

> The all-you-can-eat buffet offers a grain, two vegetables, three or four entrees, two soups and a 30–item salad bar for $5.95. In all, 30 entrees and 20 soups are served on a rotating basis. Specialties include lasagna prepared with tofu ... and the vegetable soup. A la carte items sell for $3.95 a pound.

> A juice bar, consisting of bottled juices ($1.75), natural sodas (50 to 85 cents) and smoothies and coladas ($1.75), offer [sic] creations like the Purple Cow, a non-dairy shake made with orange juice, blueberries, bananas and grapes.

Appendix at A76.

**10.** The tract also notes: "fresh carrot juice now available; full juice bar opens Feb. 1st."

Living Faith's advertising—totalling $15,500 over a two-year period—is another relevant factor in determining that it is engaging in activities for a nonexempt purpose. *See Junaluska Assembly Housing, Inc. v. Commissioner*, 86 T.C. 1114, 1123 (1986). So, too, is its lack of plans to solicit contributions. *See Federation Pharmacy*, 625 F.2d at 808. Although Living Faith states that it has received donations from members of the Seventh-day Adventist Church (its financial statements show that it received approximately $101,000 in "donations" for the 1987 operating year and $46,000 for 1988), the record does not document the sources of these donations. Living Faith relies exclusively on its own financial statements, and on memoranda it submitted to the Commissioner during the application process. However, its own arguments and statements, solely by virtue of being included in the administrative record, are insufficient to establish the source of the donations. *See Easter House*, 12 Cl.Ct. at 486–87. Similarly, although Living Faith states that it occasionally provides free meals to the needy, in exchange for chores, and has provided more than 100 bags of clothing to charity, the record provides no documentation other than Living Faith's own statements. *See Senior Citizens Stores*, 602 F.2d at 713–14 (in finding substantial nonexempt purpose, court noted that plaintiff had "submitted little evidence" to support its claim, and had failed to keep complete records of charitable distributions).

■ Living Faith's financial statements show that its operations grossed $280,000 from paying customers during the 1988 fiscal year. Despite these gross profits, Living Faith asserts that its lack of net profits indicates that its purpose is indeed tax exempt. Although Living Faith is correct that a failure to show a profit is relevant in determining the presence or absence of commercial purposes, *Golden Rule Church Ass'n v. Commissioner*, 41 T.C. 719, 731 (1964), it is only one factor among several, and does not per se entitle an organization to exempt status. *Elisian*

*Guild*, 412 F.2d at 125; *Schoger Found. v. Commissioner*, 76 T.C. 380, 387 n. 6 (1981). This is especially so where, as here, the lack of profits occur during an organization's early period of existence. *See Schoger Found.*, 76 T.C. at 387 n. 6 (even if petitioner were operating at a deficit "during this early period of existence," it would not counterbalance the other facts indicating nonexempt purpose). *Cf. Golden Rule Ass'n*, 41 T.C. at 731 (considering "consistent nonprofitability" to be evidence of an absence of commercial purpose).

Other factors reveal additional evidence of a commercial purpose. Living Faith's hours of operation, for example, are substantially competitive with other commercial enterprises; although closed on Saturdays, the Sabbath for members of the Seventh-day Adventist Church, its Country Life restaurants are open 40 hours each week, and the health food stores for 55. The various activities sponsored by Living Faith, such as the Bible study classes and the free meals periodically offered to the public, are offered after hours and thus do not interfere with routine business operations.[11]

■ In urging us to reverse the Tax Court's determination, Living Faith relies heavily upon *Golden Rule Church Association v. Commissioner*, 41 T.C. 719 (1964). The petitioners in *Golden Rule* were a church and two of its subsidiaries, one which operated several businesses as vehicles for spreading the church's religious doctrines, and the other which held property for the church. The Commissioner sought to tax income the property-holding subsidiary had derived from the sale of timber on property it had purchased. In denying a tax exemption, the Commissioner relied on various other activities, unrelated to the timber sale, which had given rise to net operating losses over a period of more than ten years. The Tax Court reversed the Commissioner's adverse determination. Living Faith argues that *Golden Rule* is analogous to the instant case, and maintains further that *Golden Rule* appeared to give "controlling significance" to the peti-

---

11. The record does not indicate when the free meals to the needy were provided.

tioners' good faith assertion of religious purpose. Appellant's Reply Br. at 15.

We find the scenario in *Golden Rule* distinguishable from the present case. First, unlike Living Faith, which conducts the primary activity of operating two restaurants and health food stores, the organization in *Golden Rule* operated a variety of small businesses, the very purpose of which was to illustrate to the public that the "golden rule" can be applied to one's daily business activities. *Id.* at 726. Indeed, the petitioners in *Golden Rule* had closed at least one of these businesses, because it had turned out to be "a poor illustration of the concepts the church tried to demonstrate to the public." *Id.* at 724. Additionally, the petitioners had sustained "consistent and substantial" operating losses for most of the businesses over an eleven-year period. *Id.* at 731. In contrast, Living Faith's financial figures—which include its fledgling period—reflect a substantial increase in gross profits, from $73,-000 for the fiscal year ending September 30, 1987, to $280,000 the following year, and a decline in operating losses during the same periods. Moreover, the businesses in *Golden Rule* were operated by "student ministers," who, unlike the Living Faith "volunteers," received no salaries and whose total time was under ecclesiastical direction. Living Faith's records indicate it paid salaries of more than $25,000 in fiscal year 1987 and $63,000 in 1988. Finally, the student ministers in *Golden Rule* were rotated among various projects "to maximize the variety of their experiences with the public," *id.* at 725, and the organization made no effort to create specialists in order to foster efficiency of operation. *Id.* The *Country Life* guidelines under which Living Faith operates, however, require that, among other things, its management have business ability and six months training in a Country Life store. Given the numerous distinguishing factors, the result in *Golden Rule* is not compelled here.

We also reject Living Faith's claim that the Tax Court in *Golden Rule* gave "controlling significance" to the petitioners' assertion of religious purpose. Although the court recognized the petitioners' espoused purpose, it specifically stated that it "must always be guided by the character of the organization and its activities," *id.* at 729, and further noted that "[i]t does not necessarily follow that we must accept all claims that activities are religious simply because those claims are sincere." *Id.* at 730 n. 10.

Living Faith's situation is closer to that of the organization denied exempt status in *Schoger Foundation v. Commissioner*, 76 T.C. 380 (1981). The petitioner in *Schoger*, a not-for-profit corporation, operated a lodge located in the mountains of Colorado, and promoted the facility as a lodge "for Christian families." The lodge offered various recreational activities. It also offered religious activities—operated without a set program—including daily devotions and Scripture reading after breakfast, Sunday morning worship for guests requesting the service, and discussion seminars, Christian song sessions, and "share sessions" conducted by staff members. *Id.* at 382. Attendance at both the recreational and religious activities was strictly optional. *Id.* at 382–83. Although the lodge conducted only minimal advertising, a brochure—which referenced recreational activities and accomodations as well as religion—was provided to potential guests. *Id.* at 383–84. While the court recognized that "specific mandatory religious activities are not necessarily required" to obtain exempt status, it added:

> [T]here must be something more than the fact that Christ Haven Lodge is promoted as a lodge "for Christian families." ... It is difficult to see how that experience differs, if it does, from the same experience one can have at any quiet inn or lodge located in the beautiful mountains of Colorado.

*Id.* at 388.

Similarly, it is difficult to see how the experience of dining or shopping at Living Faith's restaurant and health food stores differs, if it does, from the same experience one might have while dining or shopping at other vegetarian restaurants and health food stores. Granting a tax exemption to Living Faith would necessarily disadvantage its for-profit competitors. *See Feder-*

*ation Pharmacy,* 625 F.2d at 808. We do not doubt the sincerity of Living Faith's beliefs, and we recognize its good faith in asserting a religious purpose of health promotion. Based on the record before us, however, we must uphold the Tax Court's determination that Living Faith operates with a substantial commercial purpose as well, and is therefore not entitled to § 501(c)(3) tax-exempt status.

## C.

██ Living Faith further argues that the Tax Court's method of determining the existence of a substantial nonexempt purpose violates the free exercise clause of the first amendment by unconstitutionally discriminating against less orthodox religions. It maintains that by focusing on the nature of its activities, the Tax Court may have been unduly influenced by its own subjective judgments as to which activities it views as "generically religious." Appellant's Br. at 26. Living Faith contends that scrutiny of an organization's activities threatens less orthodox religions, by, in essence, providing a basis for denying exemption simply because the activities are not of a type typically conducted by mainstream religious organizations.

We disagree. In our view, the Tax Court cast no aspersions on the sincerely held beliefs of Living Faith. Rather, it applied § 501(c)(3) on a neutral basis, relying on appropriate factors to determine whether Living Faith's operations advance a substantial nonexempt purpose. As we have noted, "[e]xemption from income taxation is a matter of legislative grace," *Granzow v. Commissioner,* 739 F.2d 265, 268 (7th Cir.1984). It is "not a constitutional right." *Incorporated Trustees of the Gospel Worker Soc.,* 510 F.Supp. at 380 (quoting *Parker v. Commissioner,* 365 F.2d 792, 795 (8th Cir.1966), *cert. denied,* 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967)). "As long as exemptions are denied . . . on a nondiscriminatory basis using specific and reasonable guidelines and without inquiry into the merits of the particular religious doctrines, the withholding of religious exemptions is permissible under the Constitu-

tion." *Id.* (quoting *Parker,* 365 F.2d at 795). *Cf. Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 ("right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability' ") (quoting *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring)).

The Tax Court did not, as Living Faith asserts, inquire into the merits of Living Faith's religion and label as "false" certain Seventh-day Adventist teachings. Rather, the court found that Living Faith's religious purposes, although sincere, did not sufficiently mitigate the "clear commercial purpose" of its operations. "The term 'religious purposes' is simply a term of art in tax law, just like 'collapsible corporation' or 'Section 306 stock.' " *Dykema,* 666 F.2d at 1101. Living Faith was not denied exemption because the Tax Court refused to recognize as legitimate its espoused religious purpose of promoting health, but rather because Living Faith's activities were also motivated by a substantial nonexempt purpose, which thus vitiated the exemption under relevant tax law. *See Manning Ass'n,* 93 T.C. at 611.

As we have stated previously, "[t]he IRS has the same monitoring function with respect to all [§ 501(c) ] groups, namely to determine whether their actual activities conform to the requirements which Congress has established as entitling them to tax exempt status." *Dykema,* 666 F.2d at 1101. Examining an organization's activities allows the IRS and the courts to make a determination regarding exempt status "without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment." *Id.* at 1100. The Tax Court in this case appropriately made such a determination, based on the facts as contained in the administrative record and not on the merits of the Seventh-day Adventist faith.

We find that the Tax Court's decision that Living Faith operates for a substantial commercial purpose and does not qualify as a tax-exempt organization under § 501(c)(3)

is not clearly erroneous, but is supported by substantial evidence in the administrative record. The decision of the Tax Court is

AFFIRMED.