TONY AND SUSAN ALAMO FOUNDATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Alamo Found. v. Commissioner
Docket No. 39921-85X.
United States Tax Court
T.C. Memo 1992-155; 1992 Tax Ct. Memo LEXIS 160; 63 T.C.M. (CCH) 2422; T.C.M. (RIA) 92155; March 18, 1992, Filed *160 An appropriate decision will be entered. Kenneth R. Mourton and Neal Ross Pendergraft, for petitioner. Michael W. Bentley and Daniel C. Brauweiler, for respondent. DAWSON, NAMEROFF
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Larry L. Nameroff pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE NAMEROFF, Special Trial Judge: In 1984, after examining the records and activities of the Tony and Susan Alamo Foundation (A Non-Profit Corporation) for the years 1977 through 1980, respondent retroactively revoked petitioner's tax exempt status for years beginning after December 31, 1976. Having exhausted its administrative remedies, *161 petitioner brought this action for declaratory judgment pursuant to section 7428 seeking a reversal of respondent's action. Pursuant to Rule 217(a), [2] petitioner requested a trial in this case, in addition to submission of the administrative record, which we granted. The issues presented are whether petitioner is operated exclusively for religious, charitable, scientific, or other exempt purposes and whether any part of petitioner's net earnings inures to the benefit of private individuals. FINDINGS OF FACT At the time the petition was filed herein, petitioner's principal place of business was located in Alma, Arkansas. Petitioner was incorporated under the laws of the State of California on January 29, 1969. The *162 articles of incorporation therein provided that petitioner was organized under section 501(c)(3), generally, to establish, conduct, and maintain an Evangelistic Church, to carry on and to conduct schools for the study of the Holy Bible, to secure the Americanization of the foreign born, and to care for the needy. The incorporating directors were listed as Tony Alamo (Tony), [3] Susan Alamo (Susan), and Phyllis Gromousky (n.k.a. Cathy Wylie), with a listed address of 1932-1/2 Cahuenga, Hollywood, California. On May 1, 1974, petitioner filed a Form 1023, Application for Recognition of Exemption under section 501(c)(3), with respondent's District Director in Los Angeles. Therein, petitioner stated that its financial support came from the general public *163 and its followers, and that other support came from the operation of a thrift store, gasoline service station, and laundromat. Petitioner also represented that it telecast weekly television programs and distributed brochures describing the work of the foundation. However, petitioner stated that there was no organized fund-raising program operated by the foundation. Form 1023 further described petitioner's activities as seeking out persons who are discouraged, poor, and needy, so as to provide teachings, food, and shelter. On or about December 18, 1974, respondent issued a determination letter wherein petitioner's application for recognition of exemption was granted and petitioner was determined to be exempt from Federal income tax under section 501(c)(3) for years beginning May 1, 1974. By letter dated August 8, 1985, respondent made a final adverse determination with respect to petitioner's exempt status under section 501(c)(3). Specifically, respondent determined the following: It is determined that you are not organized and operated exclusively for exempt purposes. More than an insubstantial part of your activities are not in the furtherance of an exempt purpose. You *164 serve private rather than public purposes. You are operated for the primary purpose of carrying on unrelated trades or businesses. Furthermore, net earnings inure to the benefit of private individuals.
The administrative record in this case consists of 10 volumes of files, generally consisting of correspondence between petitioner and respondent, petitioner's accounting records, articles of incorporation, corporate resolutions, and application for exempt status pursuant to section 501(c)(3), as well as respondent's examiner's report, and revocation of petitioner's exempt status. The parties also submitted a stipulation of facts, and two supplemental stipulation of facts, as well as various exhibits introduced separately at trial, a substantial portion of which consisted of photographs and corporate resolutions. The corporate resolutions were authorizations to purchase certain items, or to engage in certain activities, all with the avowed purpose of being in furtherance of petitioner's mission, i.e., the spreading of the Gospel. The entire record contains numerous instances of duplicative corporate resolutions in the administrative record, the stipulations, and those introduced *165 at trial. We note that no summary was prepared by either side concerning the various activities represented by the resolutions, according to year or by volume of expenditure. The accounting records for all years (apparently prepared by independent accountants who were neither associates nor members of petitioner) were generally incomplete. A working trial balance was supplied for all years. The profit and loss figures generally tied, in total, to the Forms 990, Return of Organization Exempt from Income Tax, for each year. However, overall, financial data for 1977 and 1978 were more complete than for 1979 and 1980. For example, gross sales figures for the various entities could be traced from the cash and sales journal to the working trial balance for 1977 and 1978. Similar documentation regarding 1979 and 1980, however, was not provided. Records supplied for some years (but not all) consisted of adjusting journal entries, depreciation schedules, inventory, cash finance journal, cashier's check disbursement journal, donations to foundation, cash and sales journal, cash disbursements journal, accounts payable journal, and intercompany transfers. No certified financial statements *166 were provided. At the outset, we note that the testimony in this case (in excess of 1,700 pages) was largely conflicting and confrontational. Petitioner's witnesses, who generally are still foundation members (with some exceptions), testified that all of petitioner's activities were in furtherance of spreading the Gospel of Jesus Christ, while at the same time rehabilitating physically, mentally, and spiritually downtrodden people through religious training, counseling, and industrial education. Most of respondent's witnesses were former members of petitioner, and, not surprisingly, characterized petitioner's activities as generally money-making operations, operated for the sole and exclusive benefit of Tony and Susan. As with any family dispute, the truth falls somewhere in the middle. Although we believe that, in most cases, the witnesses testified honestly and forthrightly, the discrepancies reflected a fundamental difference in perception. The Early Years
Beginning in 1969, Tony, a self-professed teacher of Christianity since 1965, and Susan, a self-professed teacher of Christianity since 1952, preached [4] throughout the United States, specifically on the streets of *167 Hollywood, California, predominantly to young people. A substantial number of these individuals were involved in drugs and other illegal activities. Petitioner's prime activity during 1969 and the early 1970s was to witness [5] to people in the Los Angeles area, and encourage people to attend petitioner's religious services, with the goal of saving their souls. The services consisted of singing Gospel hymns, testimony by foundation members, and a sermon by Tony, Susan, or another minister, followed by an altar call. A free meal was provided after services. *168 In addition, those who attended the church services were encouraged to live in a quasi-community setting as petitioner's associates. Petitioner provided housing at various locations in the Hollywood area and at its headquarters in Saugus, California. The living conditions in Saugus during 1969 and the early 1970s were fairly primitive, although Tony and Susan were furnished with a house built by the associates. Respondent's Report of Examination -- Exempt Organizations, dated February 16, 1983, listed 196 acres of property at the Saugus location, which included a church, corrals and stables, a motel and trailer court, a motel and lodge, commercial highway frontage, and housing for the associates. The administrative record contains no information regarding when these properties were purchased by petitioner. However, from the testimony at trial, it appears that petitioner began purchasing property in Saugus in the early 1970s. Apparently, petitioner also rented various homes in the Hollywood area in the early 1970s. Food for the foundation was either purchased or obtained through "pickups", which consisted of associates obtaining discarded food at supermarkets. New members *169 typically donated their possessions to the foundation. Medical treatment was provided for the associates on an emergency basis. During the early years, as well as 1977 through 1980, foundation members received a weekly allowance, purported to be less than $ 10. Those who were attuned to petitioner's theology, but did not live on petitioner's property, were termed "visiting christians". During the early years, associates spent the majority of their time studying the Bible, witnessing, distributing tracts, [6] and attending daily services. Petitioner organized witnessing crews that would travel to different cities, to witness and pass out tracts. In addition, petitioner presented a weekly television program, wherein Tony and Susan would generally preach, followed by testimony of associates, recounting how they became Christians. Petitioner's choir and orchestra would also perform. In 1973, Susan, during a religious service, exhorted *170 the associates to obtain employment in order to purchase new shoes and clothes for Easter. Thereafter, many of the members obtained employment. Some members went to Bakersfield, California, to work on tree crews for the U.S. Forest Service or a timber company on a contract basis. All earnings therefrom, as well as money earned from other sources by the associates, were turned over to petitioner. Around this time, petitioner's primary activity changed from studying the Bible, witnessing, and passing out tracts to generating funds. Petitioner's activity of tract printing declined from a full-time to a part-time activity. In 1974, 1975, and 1976, many of the associates were getting married and starting families. More facilities were required by the community. Petitioner was unable to obtain building permits to build more living facilities in Saugus. Accordingly, petitioner moved its principal place of operations to Arkansas. Nevertheless, during 1977 through 1980, petitioner still maintained a base of operations in Saugus, and conducted daily church services there. The Arkansas Years
In 1974, petitioner began moving its principal place of operations from Saugus to Dyer, *171 Arkansas. During the years at issue, petitioner's principal place of operation was also in Dyer. Throughout the early years, and the years at issue, Tony and Susan were the supervisors of petitioner's entire organization. Tony and Susan ran the church services and christian outreach programs. In addition, Tony acted as administrator, approving or disapproving all of petitioner's major expenditures. Requests for personal items by the associates were submitted on a "needs list", which Tony would approve or disapprove. Similarly, a "finance list" representing capital expenditures was submitted to Tony, as was a "bills list", which included all of the recurring monthly bills. With few exceptions, Tony signed all the checks written to pay petitioner's expenses. The corporate resolution process was generally performed after the fact for major purchases. How far after is unclear. At a minimum, petitioner was somewhat lax or negligent in its record keeping. The corporate resolution process was more fiction than fact. The majority of the resolutions contained no backup invoices. Generally, the resolutions were signed by Tony, as president, and a vice president (whose identity *172 changed frequently). It was common practice to clarify the purpose or intent of the resolutions by making additions thereto, either as to dollar amounts or language, at a later date. In any case, all resolutions pertained to those matters previously decided upon by Tony. Few resolutions specifically authorized expenditures for the benefit of Tony and Susan. Foundation members constructed residences for the associates in Arkansas at four locations: in Dyer; on Georgia Ridge, a designated location within the immediate vicinity of Dyer; in Alma, Arkansas, located west of Dyer at the intersection of Highways 71 and 40; and in Mountainburg, Arkansas, located northeast of Dyer. [7] Respondent's Report of Examination -- Exempt Organizations listed 56 acres of highway frontage in the Alma area, 18 acres in Alma, 243 acres on Georgia Ridge, 25 acres in Dyer, 14 acres in Mountainburg, and a 30-acre hog farm. Generally, the various activities were situated at the highway locations, i.e., a restaurant, gas stations, thrift and grocery stores, and an auto repair shop. Numerous homes, duplexes, dormitories, and apartments were constructed or purchased for housing associates. A business office, *173 print shop, the Alamo's residence and office (sometimes referred to as the "Spec House"), cafeteria, club house, and chapel were constructed on Georgia Ridge. In addition, during 1977 and 1978, foundation members constructed the Holiness Tabernacle Church in Dyer. *174 Daily prayer meetings and religious services were held, and a Sunday religious service was held in the Holiness Tabernacle Church. Petitioner provided residences or living quarters to most of its members during 1977 through 1980. Petitioner also provided utilities, clothing, personal needs, and food for its associates, as well as recreational facilities, which included a swimming pool, tennis courts, basketball courts, backboards, and a weight room. In addition, petitioner provided associates access to necessities and toiletries at foundation operated stores and thrift shops. Petitioner operated the following entities in some or all of the years at issue. (See the appendix for a schedule of gross sales, as reported in petitioner's working trial balance.) First, the Alamo restaurant was located at the intersection of highway 71 and interstate 40 just outside of Alma, Arkansas, and was open 24 hours per day. Petitioner's advertisements for the Alamo Restaurant carried likenesses of Tony and Susan in western clothing, and indicated that it was "Where the Stars Dine". Other advertisements contained a drawing of the Alamo Mission in San Antonio, Texas. During 1977 through 1980, *175 dinner shows were held, entertaining from 500 to 700 people. Entertainers such as Dolly Parton, Brenda Lee, Tammy Wynette, George Jones, Hank Williams, Jr., and Roy Orbison performed at some of the dinner shows. The restaurant was mostly staffed by foundation members, although outside workers were hired from time to time. Any tip money received was collected and given to Susan (to spend at her discretion). A Western Union outlet (Alamo Telegraph) was also run out of the restaurant, beginning in March 1977. The Alamo Telegraph provided a means to wire funds to out-of-state witnessing crews and associates on foundation business. Second, petitioner operated three clothing stores: the Alamo of Nashville in Nashville; the Alamo of Nashville in Alma; and the Alamo on Vine in Hollywood. Although allegedly operated during 1977 through 1980, no records were provided concerning the Alamo on Vine clothing store. Billed as "the glitter store of the world," the Nashville store primarily sold western wear and accessories, which included hand crafted studded jackets. The store catered to many country music entertainers, and sold custom clothing, and a limited amount of jewelry and fur hats. *176 Extensive marketing efforts were undertaken, ranging from billboard signs to television spots to mail order catalogs. The Alma store sold similar merchandise. Petitioner also operated what appears to be a clothing distribution company called Tennessee Country Boy. Third, petitioner owned a two-story, brick veneer house in Nashville, at which the Alamos would stay when visiting Nashville. The house also served as the living quarters for some of the associates who worked in the Nashville store. Petitioner also owned the commercial property where the Alamo of Nashville was located, as well as a church in Nashville, located at another property. Fourth, petitioner operated the Alamo Kerr McGee and Alamo DX service stations in Alma. Petitioner made cash purchases through Alamo Petroleum, which was created solely as a check cashing and clearing entity. The accounting for Alamo Petroleum was conducted through the Kerr McGee. Fifth, petitioner ran Alamo Farms and Bosco Feeds beginning in June 1979. Alamo Farms was a hog farm and Bosco Feeds supplied feed for the farm. The hog farm would have from 1,000 to 7,500 hogs in inventory at any one time. Hogs were typically shipped to *177 Memphis, via Alamo Freight. Petitioner started Alamo Freight in May 1978. Alamo Freight provided transportation of goods and materials between Saugus, Alma, and Nashville, as well as the hogs to Memphis. Alamo Freight would solicit back hauls from other commercial outlets, when there were no back hauls between petitioner's entities. Sixth, Alamo Auto was started in June 1977. The auto shop served two purposes: to service the public for auto repairs, and to maintain petitioner's fleet of autos and trucks. The auto shop was primarily staffed by associates; however, several outside mechanics were hired by petitioner. Seventh, Alamo Construction built many of the structures utilized by petitioner in Arkansas. Alamo Construction was primarily staffed by associates, but it is clear that petitioner also employed many outside workers. Petitioner also actively solicited outside construction work from the general public. No records for this activity regarding 1977 and 1978 were provided. Eight, the Fort Smith Mobile Nursery provided landscaping for foundation projects, as well as for outside customers. Petitioner started Alamo Ready-Mix, a concrete batch plant, in July 1978, located *178 on 2 acres of land. Alamo Ready-Mix poured concrete for outside customers, as well as for foundation building projects. Ninth, the Alamo Bandito (grocery store) was operated during 1977 through May 1978. The Alamo Discount Grocery was also operated during the years at issue. Tenth, Alamo Candy Co., and Fleetwood Candies were rebagging operations. Petitioner produced a catalog of confectionery products for the purpose of selling candy and hired outside sales representatives. Eleventh, petitioner operated Alamo Shoppers Emporium during the years at issue. We are unable to determine the extent of this activity during 1977 through 1980. Twelfth, petitioner also purchased and began to operate a 10-unit motel, the Tempe Towers Motel, in Arizona in March 1979. Minimal records concerning this activity were provided. Thirteenth, Alamo Records was formed to promote the Gospel by promoting records cut by Tony and some of the associates. [8] Minimal activity was reported during the years at issue. Hartford Advertising was used to purchase all of the radio and television time for petitioner's religious broadcasts. *179 Fourteenth, petitioner operated sewing rooms in Saugus and Dyer during 1977 through 1980. The sewing rooms sewed choir robes, dresses, waitress uniforms, diapers, quilts, bedspreads, maternity clothes, and children's clothes for use by foundation members. However, the sewing rooms also generated many custom clothes for the various retail outlets. Although there are no inventory records to determine the volume of clothing produced, there was credible testimony that it was substantial. Fifteenth, throughout the years, Alamo associates continued to earn money from tree crews working for the U.S. Forestry Service and others. Conspicuously absent from the record is how much income was generated from the tree crews for the years in issue, or how the tree crew activity was accounted for. There was testimony that the tree crews may have earned in excess of a million dollars per year. However, there are no records from which the amount of net earnings can be determined for any of the years at issue. Other businesses which were conceived of but, apparently, never embarked upon included Jeans Logging Co., Southwest Business Management, Alamo TV and Electronics, North American Leasing, *180 Alamo Quarries, Alamo Land Development, Alamo Packing, Alamo Plumbing, Nashville Today, and Holiness Tabernacle School. [9]
The above activities were workshops designed to provide a place for the associates to witness to the public, as well as provide rehabilitation for the associates, in that they were able to interact with the public on a daily basis. There was no formal manager for each of the businesses, but rather whoever had been working in the business the longest would assume responsibility and assign the work. Although the advertising for the various businesses did not indicate that they were related to an exempt organization, petitioner's witnesses maintained that the workshops were in reality "churches in disguise". Not surprisingly, respondent's witnesses painted an opposite picture, generally characterizing the businesses as being operated solely and exclusively for profit and generally for the benefit *181 of Tony and Susan as individuals. There was witnessing and distribution of tracts at the various businesses, although the opportunity to witness was greater in some businesses based upon the nature thereof. However, the primary function of these activities was to generate income. During 1977 through 1980, petitioner's Forms 990 [10] show gross sales from its commercial trades or businesses of $ 2,678,315 in 1977, $ 3,347,529 in 1978, $ 5,723,666 in 1979, and $ 6,963,656 in 1980. The excess of receipts over expenses and disbursements were $ 678,7532 in 1977, $ 504,738 in 1978, $ 1,087,152 in 1979, and $ 699,445 in 1980. Total assets of $ 5,971,825 were reported in 1977, $ 6,622,958 in 1978, $ 4,845,183 in 1979, and $ 5,967,447 in 1980. *182 Tony and Susan's Lifestyle
A substantial portion of the evidence pertained to the lifestyle of Tony and Susan, and the alleged private inurement to the Alamos regarding jewelry, furs, clothing, automobiles, personal residences, travel, antiques, and currency. Because of the absence of adequate records on this subject, much of the evidence concerning these items is anecdotal. The parties stipulated that, during 1977 through 1980, petitioner kept no records concerning the amount of currency it provided Tony and Susan, the amount of clothing supplied to all members, the value of food and toiletry items to particular members, the number and frequency of use of its vehicles, or travel expenses incurred by its members. Moreover, the parties stipulated that Tony and Susan individually had credit card accounts with various department stores and oil companies. Tony and Susan also had sole signatory authority over credit cards issued in petitioner's name. The Alamos' Federal income tax returns for 1977 through 1980 show no income from any source. More significant are the Forms 990 for 1979 and 1980, which report that expense account and other allowances concerning Tony and Susan *183 "were not determinable from books". Petitioner maintains that the Alamos were required to wear expensive clothing in their representative capacity as leaders of the foundation, especially concerning public appearances on television and during church services. The corporate resolutions reflect $ 11,685 in 1979, and $ 10,000 in 1980, spent on Susan's clothing. Several purchase invoices for women's clothing reflect alterations, even though the purchases had ostensibly been made "for resale". The record reflects four men's silk shirts purchased for $ 1,431, which included sales tax [11] (and thus not purchased for resale). According to several witnesses, Susan was observed wearing expensive gowns, custom-made mink coats, diamonds, necklaces, and broaches. Tony was observed wearing elevator boots, expensive jewelry, and custom-made suits and shirts. According to two witnesses *184 who purchased merchandise for the various businesses and for the Alamos personally, during 1977 through 1980, Tony's suits cost in excess of $ 1,000 each. Concerning furs and jewelry, the administrative record is far from complete. Inventory records were provided by petitioner for 1977, 1978, and 1979, but not 1980. The inventory records submitted show fur hats in the inventory of the Alamo of Nashville of $ 8,919 for 1977 and $ 5,984.25 for 1978. The 1979 inventory shows $ 2,009 of jewelry. [12] Photographs show jewelry and furs in the Nashville store, although the date the photographs were taken is unknown. [13] The cash disbursement journals for 1977 and 1978 and the accounts payable journals for 1979 and 1980 indicate no major purchases from apparent fur or jewelry vendors. [14]
*185 A compilation of the corporate resolutions shows jewelry, allegedly purchased for resale, of $ 9,776.36 in 1977, $ 6,000 in 1979, and $ 74,000 in 1980. Resolutions concerning furs show purchases, also allegedly for resale, of $ 8,145 in 1978, $ 1,980 in 1979, and $ 29,595.55 in 1980. The administrative record contains affidavits of two jewelry vendors. One vendor stated that he made two separate appraisals of rings for Susan. The first, a 10-carat white gold ring with emeralds and diamonds, in June 1977, for $ 11,000; the second, a 14-carat diamond ring, in September 1977, for $ 6,700. The second vendor stated that on May 1, 1978, Tony paid $ 1,888.50 for another ladies' diamond ring. After moving to Arkansas from California in 1974, the Alamos lived in Susan's childhood home in Dyer, which was substantially remodeled by petitioner, from 1974 through late 1979. At that time, they moved to the "Spec House" [15] on Georgia Ridge, a geographical location of several hundred acres located about one-half mile north of Dyer. The Alamos lived on the second floor. The first floor served as a second office on Georgia Ridge, as well as a chapel. There were only two entrances to Georgia *186 Ridge, which were guarded 24 hours. A corporate resolution dated March 25, 1979, authorized the construction of a two-story, 14,000-square-foot home, on Georgia Ridge. The house was to consist of: Concrete basement with open web steel joist floor, wood frame walls, 1/2" drywall interior, steel building frame with 2 X 6 wood frame walls, brick exterior, intergrid drop system ceiling, steel roof with vermiculite covering and built up hot tar roofing; 100' solarium with retractable roof panels; two brick fireplaces, one marble faced; polished stone floors dining room, five 25 pane colonial light framed windows; 6 corinthian pillars on supported front porch; 25 tons forced air, air conditioning; central forced air heating; 6" fiberglass insulation interior and exterior walls; 6 vehicle carport; 40' X 40' heart shaped *187 swimming pool; complete intercom and paging system throughout house and poolside; custom kitchen with 2 jet air ranges, two double ovens, garbage disposal and compressor, custom counters and cabinet; whirlpool, sauna, gymnasium, and massage room in basement; custom metal spiral staircase; gazebo; concrete driveways, gutters, sidewalks; upon completion to have a value of $ 3,000,000 * * *.
The corporate resolutions indicate purchases of antique furniture "for investment" of $ 9,000 in 1979, and $ 55,174 in 1980. The 1979 and 1980 corporate resolutions, in addition, authorize expenditures for chandeliers, fireplaces, drapes, and a satellite dish. A corporate resolution dated June 20, 1978, authorizes the purchase of a glass solarium for the Spec House in the amount of $ 50,235. These items were corroborated by testimony and photographs. During 1977 through 1980, Tony and Susan traveled frequently. During that time, Susan had terminal cancer. (Susan died on April 8, 1982.) Susan's diet was restrictive, consisting of soft foods, baby foods, and fresh juices. Organic and specialty foods were shipped from California to Arkansas by air freight to the Alamos. Due to chemotherapy *188 treatments, it became necessary for Susan to wear wigs. There are corporate resolutions authorizing wigs to be purchased for Susan for $ 1,033 in 1977, $ 396 in 1978, and $ 273 in 1979. A corporate resolution dated March 13, 1980, authorized a trip to Palm Springs, California, in order for Susan to have cosmetic surgery, apparently to mask the cumulative effects of chemotherapy treatment. The resolution also provided for additional individuals needed to accompany her for security purposes. During the years at issue, the Alamos utilized various automobiles for their exclusive personal use. These included a 1974 Cadillac, purchased in 1974 for $ 16,799, a 1976 Cadillac Limousine, outfitted with a Rolls Royce grill and a moon roof, purchased in 1976 for $ 27,464, a 1980 Cadillac Seville, purchased in 1980 for $ 19,946, and a 1980 Cadillac Eldorado, which was leased in August 1980, with an option to buy. When they traveled, the Alamos usually were chauffeured in the 1976 limousine. Susan was too ill to drive, and Tony suffered from glaucoma, which impaired his ability to drive. A refrigerated truck, containing fresh fruits and vegetables for Susan, would accompany the limousine *189 on the various trips. Throughout 1977 through 1980, petitioner purchased and sold gold and silver coins and bars allegedly held for investment purposes. The corporate resolutions reflect gold and silver purchases of $ 755 in 1977, $ 18,935.40 in 1978, and $ 176,128.87 in 1980. The resolutions reflect gold and silver sales of $ 29,566.30 in 1979, and $ 239,290.60 in 1980. In corporate resolutions dated February 20, 1980, and March 17, 1980, petitioner authorized the financing of business trips, wherein various associates were to "secure low-interest loans for the Foundation, and for the buying and selling of silver and precious metals". In addition, Tony would carry large amounts of currency on his person. He would frequently take money out of cash receipts at the Alamo restaurant. Large amounts of cash, as well as gold and silver coins and bars, were hoarded at the Spec House. OPINION Shortly prior to the trial in this case, respondent filed a motion for summary judgment. Since the issues raised by the pleadings in this case were in fact tried to the Court, and given the disposition of those issues on the merits as discussed below, we do not find it necessary to address *190 respondent's motion for summary judgment based on collateral estoppel. Furthermore, respondent has not affirmatively pleaded collateral estoppel as required by Rule 39. To qualify for exemption under section 501(c)(3), [16] petitioner must show (1) that it is organized and operated exclusively for religious or other exempt purposes; (2) that no part of its net earnings inure to the benefit of any private individual; and (3) that no substantial part of its activities consists of the dissemination of propaganda or attempts to influence legislation or participation in political activities. Sec. 1.501(c)(3)-1, Income Tax Regs. Respondent has raised no issue as to the third requirement and concedes that the organizational test has been satisfied. [17] Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 217(c)(2)(A); Hancock Academy of Savannah, Inc. v. Commissioner, 69 T.C. 488, 492 (1977). *191 For an organization to be exempt from income tax under section 501(c)(3),it must show that it is organized and operated exclusively for exempt purposes. Both the organizational and the operational tests must be met. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. As stated above, respondent concedes that the organizational test is satisfied. The operational test is satisfied if the organization engages primarily in activities which further one or more of the exempt purposes specified in section 501(c)(3) and if it does not engage, except to an insubstantial degree, in activities which do not accomplish an exempt purpose. National Association of American Churches v. Commissioner, 82 T.C. 18, 28-29 (1984); Western Catholic Church v. Commissioner, 73 T.C. 196, 208 (1979), affd. without published opinion 631 F.2d 736 (7th Cir. 1980); sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Moreover, an organization is not operated exclusively for one or more exempt purposes unless it serves public rather than private interests. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Whether an organization satisfies the operational test is a question *192 of fact. Est of Hawaii v. Commissioner, 71 T.C. 1067, 1079 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 357 (1978). The term "exclusively" does not mean solely or absolutely without exception. Church in Boston v. Commissioner, 71 T.C. 102 (1978). The exclusivity requirement was explained by the Supreme Court in Better Business Bureau v. United States, 326 U.S. 279, 283 (1945): to fall within the claimed exemption, an organization must be devoted to * * * [exempt] purposes exclusively. This plainly means that the presence of a single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes.
Based upon this authority, the existence of a substantial nonexempt purpose, regardless of the coexistence of an exempt purpose, precludes an organization from qualifying under section 501(c)(3). See also Basic Bible Church v. Commissioner, 74 T.C. 846 (1980); sec. 1.501(c)(3)-1(e)(1), Income Tax Regs. *193 Making this determination is difficult at best. It is a question of fact to be determined by the facts and circumstances present in each case. Manning Association v. Commissioner, 93 T.C. 596, 603-604 (1989). To assist us in deciding this question, we note that the courts have generally focused on how an organization carries on its activities, implicitly reasoning that an end can be inferred from the chosen means. Church of Scientology of California v. Commissioner, 83 T.C. 381, 475 (1984), affd. 823 F.2d 1310 (9th Cir. 1987). Although no one factor alone is determinative, based upon the facts before us, we hold that petitioner possessed a nonexempt commercial purpose that was substantial in nature. By and large, petitioner's activities were in direct competition with other similar commercial businesses. In addition, it is obvious that substantial profits were generated from the various commercial ventures. Such factors are strong evidence of a substantial nonexempt commercial purpose. See B.S.W. Group, Inc. v. Commissioner, supra at 356-358. Moreover, petitioner's only activities to have even *194 a tangential exempt purpose appear to be Alamo Records and Hartford Advertising, each of which showed minimal activity during the years at issue. In addition, the dissemination of tracts and witnessing, which varied considerably from business to business, does not, in and of itself, require a different result. Although petitioner contends that the main purpose behind these activities was to spread Christianity to the public "by example", such activities, within the context of running a commercial business, were incidental to the underlying commercial purpose of petitioner's activities. See Riker v. Commissioner, 244 F.2d 220 (9th Cir. 1957), affg. T.C. Memo. 1955-225; Living Faith, Inc. v. Commissioner, T.C. Memo. 1990-484. Petitioner's raison d'etre was to provide subsistence to its members and economic wealth to Tony and Susan. If petitioner had ceased its operations, so too would petitioner cease. Rather than being a communal group only tangentially engaged in unrelated trades or businesses, petitioner was akin to a city of full-time workers, who also happen to pray together. Any sincerely held religious beliefs were *195 secondary to petitioner's main purpose, i.e., the operation of the businesses to provide subsistence to foundation members and economic wealth to Tony and Susan. See Shiloh Youth Revival Centers v. Commissioner, 88 T.C. 565, 581-582 (1987). Cf. St. Joseph Farms of Indiana v. Commissioner, 85 T.C. 9 (1985). See also Canada v. Commissioner, 82 T.C. 973 (1984) (which discusses the operational test under section 501(c)(3) in a similar communal setting, within the context of section 170, charitable contributions). Petitioner relies upon Golden Rule Church Association v. Commissioner, 41 T.C. 719 (1964), to support its contention that it was operated exclusively for exempt purposes. In Golden Rule, we held, based upon the facts therein, that the operation of a variety of businesses, which would normally be considered as having a commercial objective, was an essential ingredient of religious activities in that they furnished a training ground for student ministers by affording them the opportunity to learn and acquire the ability to articulate to others the teachings of their church. Moreover, in *196 Golden Rule, we found that the church incurred consistent and substantial net losses during the years at issue. As this is primarily a question of fact, Est of Hawaii v. Commissioner, supra, we find that Golden Rule should be interpreted in light of its specific facts. By contrast, petitioner in this case has not shown that its businesses were required to further the teachings of the foundation. In addition, petitioner incurred consistent and substantial net profits. Accordingly, we think petitioner's reliance on Golden Rule is misplaced. See Riker v. Commissioner, supra.
Amazingly, petitioner also relies on Shiloh Youth Revival Centers v. Commissioner, supra, a case strikingly similar to ours, but framed within the context of an unrelated trade or business under section 513. [18] Therein, we found that forestry, cleaning and maintenance, painting, and "donated labor" activities were not substantially related to a tax-exempt religious organization's (Shiloh's) exempt purposes and, thus, constituted unrelated trades or businesses taxable under section 511. Petitioner distinguishes Shiloh by *197 focusing on Shiloh's avowed purpose to make a profit, as detailed in its articles of incorporation; the requirement that all members work, as a primary goal of the organization; and that the various living centers were required to monitor their efficiency in meeting revenue goals and budgets. By contrast, petitioner contends that there was no similar profit or work goals, and that as a result of Tony's centralized control over all foundation activities, petitioner could not have possibly been run in a businesslike and efficient manner to incur a profit. We find such distinctions to have no merit. Although petitioner is clearly correct in intimating that it generally had lax controls and did not carefully observe corporate formalities, such defects do not miraculously turn a nonexempt organization into an exempt organization. (If anything, it shows a conscious for proper record keeping, which is essential for a taxpayer to carry its burden of proof in a revocation proceeding.) *198 In addition, petitioner contends that its activities are akin to those in St. Joseph Farms of Indiana v. Commissioner, supra, wherein we found that, although an order of Holy Cross Brothers was engaged in a farming activity not substantially related to its exempt purpose, because substantially all of the farm work was performed without compensation, the activity fell within the exception to the definition of an unrelated trade or business as set forth in section 513(a). In St. Joseph Farms, only 12 to 14 of the taxpayer's 167 members worked in the unrelated business. In the instant case, however, we are convinced that the vast majority of petitioner's associates were required to work long hours in the businesses in order to keep petitioner's operations functioning. Accordingly, we find St. Joseph Farms to be distinguishable on its facts. Although we hold that petitioner was not operated exclusively for religious or other exempt purposes, which holding is dispositive of this case, we will, for the sake of completeness, further address respondent's contention that petitioner's net earning inured to the benefit of private individuals. Section 501(c)(3) *199 also requires, as a condition of exempt status, that "no part of the net earnings" of the organization inure to the benefit of any "private shareholder or individual". Although they are separate requirements, the "private inurement" test and the "operated exclusively for exempt purposes" test prescribed by section 501(c)(3) substantially overlap. Church of Ethereal Joy v. Commissioner, 83 T.C. 20, 21 (1984); Church of the Transfiguring Spirit v. Commissioner, 76 T.C. 1, 5 n.5 (1981); People of God Community v. Commissioner, 75 T.C. 127, 131 (1980). Section 1.501(c)(3)-(1)(c)(2), Income Tax Regs., provides: "An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals." A private shareholder or individual is a person having a personal or private interest in the activities of the organization. Sec. 1.501(a)-1(c), Income Tax Regs.
Since "no part" of the net earnings of an organization may inure to the benefit of a private shareholder or individual (sec. 501(c)(3)), the amount or extent of such inurement or *200 benefit is not determinative. Church of the Transfiguring Spirit v. Commissioner, supra; Unitary Mission Church v. Commissioner, 74 T.C. 507 (1980), affd. in an unpublished opinion 647 F.2d 163 (2d Cir. 1981). The forbidden inurement may take the form of cash disbursements, or other less obvious forms, such as the provision of goods and services to private individuals. Texas Trade School v. Commissioner, 30 T.C. 642, 647 (1958), affd. per curiam 272 F.2d 168 (5th Cir. 1959). Cf. World Family Corp. v. Commissioner, 81 T.C. 958, 968 (1983) (the payment of reasonable compensation for services rendered does not constitute forbidden inurement). We are convinced that part of the net earnings did inure to the benefit of Tony and Susan. In other words, petitioner was operated for Tony and Susan's private benefit. The evidence in this case leads to the inescapable conclusion that petitioner's net earnings inured to benefit Tony and Susan. As recited in the Findings of Fact, there is credible, corroborated evidence of substantial amounts of jewelry, furs, clothing, automobiles, *201 personal residences, antiques, and currency being used exclusively by Tony and Susan. [19] In addition, the complete domination of petitioner's financial affairs by Tony and Susan, coupled with the lack of adequate records, also compels this Court to conclude that petitioner's net earnings inured to the benefit of Tony and Susan. In the final analysis, Tony and Susan were petitioner, hopelessly intertwined, with no separate identity, orchestrating a huge business organization (to be played by others) for their personal benefit. *202 In view of our conclusions regarding the operational and private inurement tests of section 501(c)(3), it is not necessary to address the parties' other contentions. [20]
An appropriate decision will be entered. APPENDIX GROSS SALES AS REPORTED ON PETITIONER'S WORKING TRIAL BALANCE From
Through
Business Name [21]
1977
01/01/77
12/31/80
Hartford Advertising *   01/01/77
12/31/80
Alamo Record Company
$     179
01/01/77
12/31/80
Fort Smith Nursery
60,710
01/01/77
12/31/80
Alamo Shoppers Emporium *   01/01/77
12/31/80
Alamo Kerr McGee
89,041
01/01/77
12/31/80
Alamo DX
346,938
01/01/77
12/31/80
Alamo Restaurant
425,162
01/01/77
12/31/80
Alamo Candy Company,
including Fleetwood Candies
1,498
01/01/77
12/31/80
Alamo of Nashville
68,157
01/01/77
05/30/78
Alamo Bandito
46,370
01/01/77
12/31/80
Alamo Discount Grocery
288,234
01/05/77
12/31/80
Alamo Construction *   06/01/77
12/31/80
Alamo Auto
52,561
05/20/78
12/31/80
Alamo Freight
N/A 07/01/78
12/31/80
Alamo Ready-Mix
N/A 06/27/79
12/31/80
Alamo Farms, including
Bosco Feed
N/A 01/01/77
12/31/80
Alamo on Vine *   01/01/77
12/31/80
Alamo of Nashville
453,166
01/01/77
12/31/80
Tennessee Country Boy
0  *203 Business Name [21]
1978
1979
1980
Hartford Advertising *   0   0   Alamo Record Company
$       684
$      0    *   Fort Smith Nursery
75,493
51,005
$     4,314
Alamo Shoppers Emporium *   0   0   Alamo Kerr McGee
1,302,895
1,402,394
1,171,730
Alamo DX
360,957
308,893
254,466
Alamo Restaurant
528,228
742,971
430,368
Alamo Candy Company,
including Fleetwood Candies
19,063
370,949
500,419
Alamo of Nashville
204,887
147,387
129,349
Alamo Bandito
8,631
N/A N/A Alamo Discount Grocery
340,150
486,845
444,842
Alamo Construction *   71,066
122,392
Alamo Auto
83,179
296,239
327,466
Alamo Freight *   83,255
116,169
Alamo Ready-Mix
84,717
197,951
95,927
Alamo Farms, including
Bosco Feed
N/A  *   285,913
Alamo on Vine *    *    *   Alamo of Nashville
626,051
603,932
750,404
Tennessee Country Boy *    *   84,752
*204 Note: * = Unknown; figures not determinable from petitioner's records. N/A = Not applicable Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Rule 217(a), in relevant part, provides: Disposition of an action for declaratory judgment involving a revocation may be made on the basis of the administrative record alone only where the parties agree that such record contains all the relevant facts and that such facts are not in dispute.↩
3. For convenience, we will refer to Tony Alamo and Susan Alamo as Tony and Susan, respectively. We note that the Alamos were uniformly referred to by counsel, and all witnesses, by their first names during the trial herein, rather than by Reverend, or Mr. and Mrs. Alamo.↩
4. There was no evidence submitted as to whether Tony or Susan was ever ordained as ministers by an ecclesiastical body. Moreover, petitioner was not affiliated with any higher ecclesiastical body or organization.↩
5. Witnessing has been defined as the act of giving testimony to another about the teachings of the Bible and Jesus Christ.↩
6. A tract is printed literature, in various sizes, with a gospel message on it.↩
7. There was no documentation concerning the number of foundation members during the years at issue. However, a letter dated Mar. 10, 1982, from petitioner's then counsel to respondent, lists foundation membership at 314. (Thirty-eight were listed in Nashville, Tennessee, 85 in California, and 191 in Arkansas.) In a lawsuit involving petitioner and the Department of Labor, the District Court made a finding of an average number of adult associates in the foundation of 385 in 1977, 355 in 1978, 347 in 1979, and 337 in 1980. See Donovan v. Tony and Susan Alamo Foundation, 567 F. Supp. 556 (W.D. Ark. 1982), affd. in part and vacated in part 722 F.2d 397 (8th Cir. 1983), affd. sub nom. Tony and Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290↩ (1985).
8. The administrative record contained corporate resolutions authorizing the financing and production of two religious albums, namely, "I John," dated Mar. 1, 1977, and "Mr. D.J.," dated Oct. 1, 1977. The costs incurred and distribution efforts are unknown.↩
9. However, fictitious name filings for the above entities were included in the administrative record.↩
10. Although we list financial data as reported on the Forms 990, we express no opinion as to the reliability or validity thereof. Specifically, we note that the reported disbursements contained apparent transfers between the various businesses and the foundation, the methodology and propriety of which is not determinable from this record.↩
11. The corporate resolution concerning this expenditure reflects that this was a purchase of a prototype or sample for future production purposes.↩
12. A duplicate 1979 inventory list indicated additional jewelry inventory of $ 7,800. However, we note that the $ 7,800 figure appears to be written in afterwards and was not included in the column total. ↩
13. It should be noted that petitioner entered into a license agreement with Lorimar Productions, Inc., to market, through a catalog, clothing and accessories, based upon the television series Dallas, including the names and likenesses of the series' performers portraying the characters depicted therein. The license was for the period Oct. 2, 1980, through Oct. 1, 1981, at a total guaranteed compensation of $ 200,000. Included in the catalog were advertisements for mink and fox furs, ranging from $ 2,000 to $ 7,000 each. Accordingly, the photographs of furs at the Alamo of Nashville were probably taken post-1980. We further note that a resolution dated Aug. 4, 1980, authorized a trip to Palm Springs, California, for the Alamos for 2 months in order to formulate the Dallas Commemorative Catalogue. ↩
14. Cash disbursement journals for 1979 and 1980, and accounts payable journals for 1977 and 1978 were not included in the administrative record.↩
15. Respondent's expert, John J. Boyett, estimated an original cost of $ 380,000 in June 1979. However, due to numerous inconsistencies and mistakes in methodology, we place no reliance on his report.↩
16. Section 501(c)(3) provides: Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. ↩
17. Although respondent, in her motion for summary judgment, infra↩, contends there are five issues in this case, we note that such issues are nothing more than a restatement of requirements one and two above, by which we also structure our opinion.
18. Section 513(a) provides: "The term 'unrelated trade or business' means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside form the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its * * * [religious] function constituting the basis for its exemption under section 501 * * *.↩
19. We find the testimony of former foundation member Norman Kaffen, who lived at petitioner's property in Arkansas during the years at issue, to be very credible. He testified, in relevant part, as follows: "Looking at it percentage-wise, I would say the largest percentage of the money during this period of time '77 to '80 went into the community. * * * The next chunk, I believe, percentage-wise, during this period of time, went for christian outreach. * * * The third percentage of the monies went to support Tony and Sue's very, very excessive; very abusive; very frivolous and squanderous lifestyle * * *."↩
20. Both respondent and petitioner have argued, in the alternative, whether petitioner's businesses are included or excluded, respectively, in or from the definition of unrelated trades or businesses under section 513. Respondent has further argued that foundation members, other than Tony and Susan, were the recipients of net earnings from petitioner.↩
21. All businesses were located in Alma, Arkansas, except Alamo on Vine in Hollywood, Cal., and Alamo of Nashville and Tennessee Country Boy, both of which were in Nashville, Tenn.↩