**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 12a0708n.06

**No. 11-1553**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ASMARK INSTITUTE, INC.,

     **Appellant,**

v.

COMMISSIONER OF INTERNAL
REVENUE,

     **Appellee.**

_____/

**FILED**
**Jul 03, 2012**
LEONARD GREEN, Clerk

**ON APPEAL FROM THE
UNITED STATES TAX COURT**

BEFORE:    **COLE and CLAY, Circuit Judges; MATTICE, District Judge.**[*]

    **CLAY, Circuit Judge.** Appellant Asmark Institute, Inc. (Asmark) appeals a judgment of

the United States Tax Court upholding the Commissioner of the Internal Revenue Service's decision

that Appellant does not qualify for a tax exemption as a charitable organization, pursuant to 26

U.S.C. § 501(c)(3). For the reasons that follow, we **AFFIRM**.

**BACKGROUND**

    The facts, as developed by the administrative record and as stipulated by the parties, are as

follows:

---

[*]The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee, sitting by designation.

Appellant is a Kentucky non-stock, non-profit corporation incorporated in 2005 by three individuals: Allen C. Summers; his wife, Susan Summers; and Johnnie R. Lawrence. According to Appellant's Articles of Incorporation, the corporation is "irrevocabl[y] dedicated to and [] organized and operated exclusively for charitable purposes within the section of 501(c)(3) of the Internal Revenue Code," such that "no part of [its] net earnings[]shall inure to the benefit of, or be distributable to its directors, officers, or other private persons[.]" Appellant describes its purpose as "serving as a resource center for compliance materials and services for the agribusiness industry."

Appellant is the successor entity to Asmark, Inc. (AI), a Kentucky for-profit entity incorporated in 1990 and dissolved in 2006. AI was a consulting business, specializing in regulatory compliance for the agricultural industry; specifically, AI provided compliance-related "educational material[s], training programs, and on-site inspection[]" services to farms and "farm retailers" (i.e., retailers in the business of selling goods and services to farms and farmers). AI also "developed computer programs that allowed [agricultural] businesses to file timely reports with government agencies."

AI was owned by the same three individuals who now serve as directors and officers for Appellant. In 2005, AI paid salaries and wages of $112,200 to its directors and officers and $391,368 to its other employees, for a total salary expenditure of $503,568.

AI operated out of a commercial space rented from Landmark Technologies, L.L.C. (Landmark), a for-profit company also owned by the Summerses and Lawrence. During AI's first fifteen years in operation, it made significant capital improvements to its rental space which, in accordance with the parties' agreements, became Landmark's property upon the termination of AI's

lease. In addition, Landmark leased to AI the intellectual property rights to certain of its software and technologies. Pursuant to those leases, any revisions, updates, modifications, or new versions of Landmark's intellectual property made by AI also reverted to Landmark upon the termination of AI's leases.

When AI was formed, the corporation initially served 25 clients. By 2005, AI had grown to serve some 985 clients. According to its 2005 federal income tax return, AI reported income in excess of $1.6 million and ordinary business income of $472,000.

On March 22, 2005, Allen Summers, Susan Summers, and Johnnie Lawrence incorporated Appellant under Kentucky law as a non-stock, non-profit corporation. Two months later, Appellant filed a Form 1023 with the Internal Revenue Service (IRS), seeking to be recognized as a tax-exempt organization under 26 U.S.C. §§ 501(a) and 501(c)(3). In its supporting documents, Appellant described itself as an entity "organized to help agricultural businesses comply with the myriad of OSHA, EPA, and DOT regulatory requirements. [Our] mission is the same as [our] predecessor, [Asmark, Inc.] . . . a for-profit corporation, except that [Asmark Institute] will be able to provide services to a substantially greater number of agricultural businesses through an alliance with national, regional, and state trade associations." Appellant further explained that, "[t]he services provided by [Appellant] are the same [as those that were provided by AI]. The difference is that Asmark Institute will have many more clients through their partnering with state and national associations and there will be public access to programs via the internet."

Appellant indicated that it anticipated a "substantial growth in clients [coming] from alliances with National and State [trade] associations." Appellant projected annual revenue around $2 million

and estimated a future client base of 6,500 clients. Appellant listed its anticipated income as derived entirely from fees for services rendered; it did not list any anticipated income from grants, donations, or fundraising operations. Appellant noted that it retained AI's same employees, including AI's three former owners. It noted that its officers' "base salary and bonus incentive [are to be] based on profit[s], gross receipts, or [a] combination of both," and projected their salaries at $533,000 for 2006, 2007, and 2008.

According to Appellant's representations, securing § 501(c)(3) status is a critical business measure for reaching those projected benchmarks. Appellant explains that tax-exempt status solves an issue that previously impeded AI's growth. Because many of the trade associations with whom AI seeks to partner are themselves non-profit entities, Appellant states that these associations are precluded from sharing revenue with a for-profit entity on private inurement grounds. Appellant contends that unless it obtains § 501(c)(3) status, it cannot partner with these non-profit trade associations. Appellant does not dispute that its application for tax-exempt status grew out of a desire to resolve this concern and to provide for expansion of AI's business model.

Appellant admits that its business model is much the same as was AI's. Appellant offers an array of "membership levels" and "service packages," which allow its clients to choose among differing levels of consulting services. Through its new affiliation agreements, Appellant also offers packages that entitle certain state and national trade associations to a percentage of the revenue collected from clients referred to Appellant through a trade association. Depending on the level of membership chosen, Appellant retains between 63–79% of the membership fee, with the balance distributed to the referring trade association. For its part, the trade association publicizes and

promotes Appellant's services to its members. Trade associations also have the option to enter directly into their own membership agreements with Appellant and then pass along free or reduced-rate access to Appellant's services to their members as a benefit of trade association membership.

In addition to Appellant's standard retainer and membership packages, Appellant also identifies specific services it claims are offered "free of charge," "at reduced rates," or "at cost."[1]

Appellant also claims that it performs "charitable" regulatory services. In materials submitted with its Form 1023, as well as in promotional materials prepared for Appellant's affiliated trade associations, Appellant stated that "[o]ne of its objectives" is to "protec[t] the retail farm centers when over-reaching regulatory agencies abuse their power," and to "suppor[t] industry efforts to ward off adverse legislation." As evidence of its regulatory efforts, Appellant cites testimony Allen Summers provided to Congress on proposed regulations restricting the sale and use of industrial fertilizer. Appellant also cites a letter Allen Summers sent to a United States Senator regarding proposed EPA regulations Summers argued would negatively affect farm retailers.

In March 2006, while Appellant's § 501(c)(3) application was pending, AI's three owners formally dissolved AI and donated all of AI's assets, such as its office supplies and equipment, to Appellant. AI's liabilities were not transferred. Through their continued ownership of Landmark,

---

[1]The services designated as free include: "Security Vulnerability Assessments," for farm retailers complying with Department of Homeland Security requirements; a "National Nurse Tank Inspection Program," for farmers interested in joining a private registration list for complying with Department of Transportation regulations related to anhydrous ammonia tanks; a web-based application for preparing and maintaining a risk management plan for facilities that store anhydrous ammonia; a web-based tool for reporting the movement of imported fertilizer into the United States; a web-based tool for preparing spill prevention plans; "Ask ERICA," a repository of interpretations of federal regulations relevant to agribusiness; and a signage program offering various regulation-related signs and posters to Appellant's members.

No. 11-1553

AI's former owners retained their rights to the physical and intellectual property that had been used for AI's operations. Landmark then entered into similar leases with Appellant for the building space and intellectual property. As with AI's agreements, Appellant's leases provide that Landmark retains the rights to any revisions, updates, or modifications made by Appellant during the course of its lease.

After reviewing Appellant's Form 1023 application, the Commissioner of the Internal Revenue Service (the "Commissioner") found that Appellant did not qualify for federal tax exemption. The Commissioner highlighted five key problems with Appellant's § 501(c)(3) application: (1) Appellant's substantial, non-exempt purpose was to operate a commercial business; (2) Appellant did not show that its earnings would not inure to the benefit of its three key officers and board members; (3) Appellant did not show that its revenue-sharing affiliations with the trade associations would not grant impermissible benefits to at least some for-profit entities; (4) Appellant did not lessen the burdens of the government, nor was Appellant recognized as performing any work on the government's behalf; and (5) Appellant's stated desire to protect its clients from regulatory enforcement actions served the clients' private for-profit interests "more than incidentally."

Following the Commissioner's unfavorable decision, Appellant filed a timely written protest and additional supporting materials with the IRS Office of Appeals, which also denied Appellant's application. Appellant then petitioned for a declaratory judgment from the Tax Court, pursuant to IRC § 7428(a). On February 4, 2011, the Tax Court upheld the Commissioner's decision. On April 21, 2011, Appellant timely filed a notice of appeal to this Court, pursuant to IRC §§ 7428(a) and 7482(a)(1).

6

## DISCUSSION

This Court reviews the Tax Court's factual findings for clear error and its legal determinations *de novo*. *See Lapham Found., Inc. v. Comm'r*, 389 F.3d 606, 609–10 (6th Cir. 2004). Whether an entity is organized and operated exclusively for a tax-exempt purposes is a finding of fact that this Court must affirm unless the Tax Court's evaluation was clearly erroneous. *Id.* at 610 (citing *Ohio Teamsters Educ. & Safety Training Trust Fund v. Comm'r*, 692 F.2d 432, 435 (6th Cir. 1982)).

In order to qualify for a tax exemption under 26 U.S.C. § 501(a), an organization must meet the qualifications laid out in § 501(c)(3). The entity must be (1) organized and operated "exclusively" for a tax-exempt purpose, and (2) have no part of its net earnings inure to the benefit of any private shareholder or individual. *Easter House v. United States*, 12 Cl. Ct. 476, 483 (Cl. Ct. 1987); 26 U.S.C. § 501(c)(3). The term "exclusively" is "a term of art" that does not require the entity to operate solely for tax-exempt purposes. *Id*. at 483 (citing Treas. Reg. § 1.501(c)(3)-1(c)(1)). Rather, the term "exclusively" means only that "not more than an insubstantial part of an organization's activities [can be] in furtherance of a non-exempt purpose." *Id*. Put in other terms, an entity is not exempt if it operates for "*any substantial* noncharitable purpose." *Ohio Teamsters*, 692 F.2d at 435 (quoting *Harding Hosp., Inc. v. United States*, 505 F.2d 1068, 1072 (6th Cir. 1974)).

To gauge whether an entity meets this standard, we apply a two-part "organizational" and "operational" test. *Accord Nationalist Movement v. Comm'r*, 37 F.3d 216, 219 (5th Cir. 1994) (citing 26 C.F.R. § 1.501(c)(3)-1). Appellant's Articles of Incorporation satisfy the organizational test, because they (1) limit Appellant's purposes to one or more exempt purposes; and (2) they state that Appellant is not to engage, other than as an insubstantial part, in activities that are not in furtherance

of a tax-exempt purpose. *Id.* Accordingly, the sole issue for our review is whether the Tax Court

clearly erred in finding that Appellant does not meet the operational test.

The operational test is met by satisfying four requirements:

First, the organization must engage primarily in activities which accomplish one or more of the exempt purposes specified in [IRC] § 501(c)(3). Second, the organization's net earnings may not inure to the benefit of private shareholders or individuals. Third, the organization must not expend a substantial part of its resources attempting to influence legislation or political campaigns . . . [Fourth,] [o]rganizations seeking exemption from taxes must serve a valid purpose and confer a public benefit.

*Id.* at 219–20 (citation omitted). The "critical inquiry" for this test is whether the entity's "primary

purpose for engaging in its . . . activity is an exempt purpose, or whether its primary purpose is the

nonexempt one of operating a commercial business producing net profits . . . ." *B.S.W. Group, Inc.*

*v. Comm'r*, 70 T.C. 352, 357 (1978).

Applying this standard, the Tax Court found that Appellant is not operated exclusively for tax

exempt purposes, because "[Appellant's] operations [are] commercial rather than charitable" and

because its activities "consist[] mainly of compliance services for a fee." The Tax Court carefully

examined each of Appellant's "free" services—that is, those services that Appellant claims are not

tied to any membership fee at any level—and found that Appellant's free services are "relatively small

in relation to all of its services." The Tax Court also concluded that many of Appellant's so-called

"free" services are, in fact, tied in some manner to fee-based membership. In addition, the Tax Court

questioned whether Appellant even performs "charitable" activities that "confer a public benefit."

The Tax Court expressed some doubt as to whether assisting in regulatory compliance qualifies as

a "charitable" activity for § 501(c)(3) purposes. Moreover, the Tax Court rejected Appellant's

lobbying activities because the court was not convinced that the discrete examples cited by Appellant

demonstrated a primary or even substantial charitable purpose. The Tax Court also noted that the government has never formally accepted Appellant's activities as its own or as those performed on the government's behalf.

On appeal before this Court, Appellant does not contest any of the facts as found by the Tax Court. Instead, Appellant argues that the Tax Court was "wrongfully influenced" by the fact that Appellant was preceded by a for-profit entity. Appellant also accuses the Tax Court of drawing improper, unfavorable inferences from the fact that Appellant charges for some of its services, despite Appellant's explanation that some fee-based services are necessary to its economic survival and to support its charitable activities. Finally Appellant argues that the Tax Court undervalued Appellant's relationship with government agencies. Although Appellant acknowledges that it has no formal government affiliation, Appellant maintains that work designed to facilitate compliance with government regulations benefits the public at large and is thus essentially charitable in nature. In support, Appellant cites a $20,000 grant it received from the EPA, along with several commendatory letters it has received from government officials.

Appellant's arguments do not demonstrate that the Tax Court committed clear error. Notably, Appellant has not controverted any of the factual findings made by the Tax Court, and Appellant has cited no cases in its brief to suggest that the Tax Court made any errors in its legal analysis. Rather, Appellant's arguments only fault the weight the Tax Court placed on certain facts that were unfavorable to Appellant's application.

Contrary to Appellant's arguments, the Commissioner was entirely correct to highlight the fact that Appellant is the successor to a for-profit entity, because such a fact "weighs heavily against

9

exemption." *See B.S.W. Group, Inc.*, 70 T.C. at 358–59. Appellant's largely fee-based business plan and its competition within a for-profit market are also "strong evidence of the predominance of [Appellant's] nonexempt commercial purposes." *Id*. While Appellant is correct that fee-based, non-exempt activities, even those rising "somewhat beyond a *de minimus* level," do not preclude a finding of tax-exempt status, *see Living Faith, Inc. v. Comm'r*, 950 F.2d 365, 370 (7th Cir. 1991) (citing Treas. Reg. § 1.501(c)(3)-1(c)(1)) (other citations omitted), Appellant nevertheless bears the burden of proving that its primary purpose is a truly exempt one, as opposed to a "commercial venture[] organized for profit." *B.S.W. Group, Inc.*, 70 T.C. at 358. Likewise, the burden rests on Appellant to prove that the profits derived from its fee-based services do not inure to the benefit of private individuals or shareholders. *See Nationalist Movement*, 37 F.3d at 220. Appellant has done neither.

It is apparent from the record that Appellant's consulting services are mainly associated with the fees Appellant receives through its various retainer agreements, membership agreements, and service packages. The sale of services, including consulting services, is commonly considered to be a non-exempt, commercial purpose. *B.S.W. Group, Inc.*, 70 T.C. at 358. "[T]he presence of a single non-exempt purpose, if substantial in nature, [] destroy[s] the exemption regardless of the number or importance of truly exempt purposes." *Am. Ass'n of Christian Sch. Voluntary Emp. Beneficiary Ass'n Welfare Plan Trust v. United States*, 850 F.2d 1510, 1513 (11th Cir. 1998) (internal citation, quotation, and alterations omitted). Even though Appellant may offer some incidental "free" services, the fact that most of Appellant's income comes from paying clients precludes § 501(c)(3) status. *Id.*; *Living Faith*, 950 F.2d at 370 (internal citations omitted).

Moreover, it appears most of Appellant's clients receive their services as part of their fee-based membership agreements, either directly with Appellant or via a relationship with one of Appellant's affiliated trade associations. For instance, several of the services Appellant lists as "free" are offered at varying prices depending on the level of a client's membership package or whether the client purchases the service à la carte. To take but one example, the "web-based tools" Appellant lists as "free" were not publicly accessible on Appellant's website when Appellant filed for § 501(c)(3) status.

Appellant's Form 1023 application is also telling. Appellant listed its anticipated income as derived solely from its fee-based operations. By contrast, it listed no anticipated income derived from grants, donations, or fundraising operations. These answers indicate that Appellant expects its commercial profits to be the main source of income sustaining its ongoing operations. *See Fed'n Pharm. Servs., Inc. v. Comm'r*, 625 F.2d 804, 808 (8th Cir. 1980). The Commissioner properly took these unfavorable admissions into consideration. *Id*.

Appellant contends that its Form 1023 responses only reflect its belief that it could not secure charitable donations while its tax status remained unresolved. However, Form 1023 only asks an applicant to list anticipated revenue and expected sources. As with Appellant's projections for its fee-based income, Appellant could have provided estimated figures for its anticipated grant income in much the same fashion. Appellant's post-hoc explanation that it understood the charitable donation question differently is unconvincing.

Appellant has also failed to prove that its profits would not inure to the benefit of private individuals or shareholders. According to Appellant's filings, its three key directors and officers

would apparently receive higher salaries than they received when they owned AI. On appeal, Appellant explains that these officers actually receive the same amount, if not slightly less, than they did before, and that the apparent difference is attributable to an accounting discrepancy. However, Appellant also admits that its performance-based compensation structure would allow these officers' salaries to increase as Appellant's business grows. Appellant has provided no proof to dispel the obvious inference that this structure is designed to allow AI's former owners to reap the increased profits Appellant expects from gaining access to a formerly unavailable client base.

Appellant's leases with Landmark are also problematic. Inurement "may take the form of cash disbursements, or other less obvious forms, such as the provision of goods and services to private individuals." *Tony & Susan Alamo Found. v. Comm'r*, 63 T.C.M. (CCH) 2422, 2431 (1992). Improvements to real estate that are not owned by the non-profit entity but which instead ultimately benefit a for-profit entity can count as private inurement. *See Tex. Trade Schl. v. Comm'r*, 30 T.C. 642, 646–47 (1958). Because of the structure of Landmark and Appellant's leases, Landmark appears to be the financial beneficiary of all improvements Appellant may make to Landmark's physical and intellectual property. Coupled with the complete overlap between Landmark's ownership, AI's former ownership, and Appellant's key officers, the adverse inference the Tax Court drew regarding the leases was not clearly erroneous.

Likewise, Appellant's revenue-sharing agreements with trade associations—some of which appear to be non-profit and others for-profit—also triggers inurement questions. Appellant attempts to dispel concerns about these relationships by comparing them to relationships that exempt entities must engage in with non-exempt entities in order to do business. (*See* Appellant's Br. 30 (citing

colleges, hospitals, day-care centers, and thrift shops as non-profit entities that must do business with for-profit entities)). However, Appellant's fee-sharing structure is not similar to these purely service-based relationships. Rather, the trade associations are not only clients of Appellant's consulting services, but also act as commissioned agents who can receive payment for referring individual farms and farm retailers to Appellant's services. This type of fee-sharing relationship may inure some of Appellant's profits to non-exempt entities—indeed the very concern that the non-profit trade associations expressed when they refused to partner with AI's for-profit business model.

Finally, Appellant's claim that regulatory compliance consulting is inherently charitable in nature is a meritless argument. "The mere fact that [an entity's] activities might improve the general economic well-being of the Nation or a State or reduce any adverse impact from the failure of Government to carry out such activities is not enough" to prove a charitable purpose. *Pub. Indus., Inc. v. Comm'r*, 61 T.C.M (CCH) 1626, 1629 (1991) (citation omitted). In order to claim a charitable purpose, Appellant must prove that the government (1) has accepted as its responsibility the activities conducted by the organization, or (2) recognizes that the organization is acting on the government's behalf. *Columbia Park & Recreation Ass'n, Inc. v. Comm'r*, 88 T.C. 1, 21 (1987). Appellant meets neither test. Appellant's only proof is laudatory statements the government has allegedly made regarding Appellant's compliance services and a $20,000 grant Appellant claims it received from the EPA. This weak evidence clearly does not satisfy *Columbia Park*'s standards.

The Commissioner argues that Appellant's efforts to prevent further regulation of the agricultural industry cannot be considered charitable because these efforts actually impede government activity. However, we need not decide this argument today. Appellant's regulatory

efforts were clearly minimal in comparison to its commercial activities, and there is no evidence to suggest that the government formally accepted or recognized Appellant's work.

## CONCLUSION

The Tax Court did not clearly err in affirming the denial of Appellant's application for § 501(c)(3) tax-exempt status. For the foregoing reasons, we **AFFIRM** the Tax Court's judgment.